# United States Court of Appeals
## For the First Circuit

No. 16-2290

JOHN DOE, MARY DOE, and JAMES DOE,

Plaintiffs, Appellants,

v.

TRUSTEES OF BOSTON COLLEGE, PAUL J. CHEBATOR,
CAROLE HUGHES, CATHERINE-MARY RIVERA,
PATRICK J. KEATING, and BARBARA JONES,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Torruella, Selya, and Kayatta,
Circuit Judges.

Charles B. Wayne, with whom Matthew J. Iverson and DLA Piper
LLP were on brief, for appellants.
Daryl J. Lapp, with whom Elizabeth H. Kelly and Locke Lord
LLP were on brief, for appellees.

June 8, 2018

**TORRUELLA**, **Circuit Judge**.  In October 2012, John Doe ("Doe") was accused of sexually assaulting a fellow Boston College student during an off-campus school event sponsored by a student organization.  Pursuant to its written policies and procedures on sexual assault, outlined in its 2012-2013 Student Guide (the "Student Guide"), and Conduct Board Procedure, Boston College held disciplinary proceedings against Doe.  After two days of hearings, an Administrative Hearing Board (the "Board") found Doe responsible for the lesser offense of indecent assault and battery, and imposed several sanctions.  Doe filed an appeal of the Board's decision, but his request for appeal was denied by Boston College officials.  In 2014, at the request of Doe's parents, Boston College conducted an independent review of the disciplinary proceedings.  The reviewer determined that the Board had properly followed the relevant procedures and that new evidence that Doe brought forth did not undercut the Board's finding.

Seeking compensatory damages, declaratory relief, a permanent injunction, and expungement of the disciplinary proceedings from his university records, Doe and his parents, James and Mary, (collectively "the Does") filed a lawsuit against Defendants Trustees of Boston College (the "University" or "B.C."), and several B.C. officials.  Following discovery, the parties filed cross-motions for summary judgment.  The district

court held a hearing and subsequently entered summary judgment on all counts in the Defendants' favor. This timely appeal followed. After careful review, we vacate in part and affirm in part.

## I. Background

### A. Factual History

#### 1. The Alleged Sexual Assault

On October 20, 2012, Doe, a senior at Boston College, attended a school event on the SPIRIT OF BOSTON cruise ship in his capacity as a journalist for the school newspaper. At around 11:30p.m., Doe -- standing 6'4" tall and wearing a purple shirt -- danced his way across a heavily crowded dance floor to reach some of his friends. While Doe was slowly moving through the crowd, a woman turned around and screamed at him. The woman, "A.B.," later testified that at that time she felt a hand go up her dress and that "two fingers were forcibly inserted up into [her] anus." After the screaming incident, Doe continued to move across the crowd until he reached his friends. Soon after, security guards escorted Doe to a separate area on the ship, where he was required to stay until the ship returned to the pier. Massachusetts State Police arrested Doe once the ship docked, and released him on bail the following morning. Forensic specialists took his clothes and several swabs from his hands, fingers, and fingernails as evidence.

The State Police arrested Doe based on the allegations made by A.B. to State Trooper David Walsh ("Trooper Walsh"). According to the October 20, 2012 Arrest Report, A.B. stated to Trooper Walsh that "while she was dancing she felt a hand go up he[r] dress and penetrate her." She further stated that "she immediately turned around and identified/looked at the person who touched her." While still at the pier, Trooper Walsh asked A.B. to step out of the police cruiser and identify the alleged wrongdoer. A.B. identified Doe as the person who touched her. Betsy, A.B.'s friend and dance partner during the school event, did not see the alleged sexual assault, but mentioned to the state authorities that A.B. told her "that the tall male with brunette hair [and] purple buttoned down shirt stuck his fingers in between her legs."

According to Doe, however, another male -- Boston College senior "J.K." -- crossed the dance floor in front of him as the alleged sexual assault occurred. Doe testified that, at the moment when A.B. screamed at him, J.K. turned to him and said, "Sorry, dude, that was my bad." The day after Doe's arrest, J.K. texted some of Doe's friends asking whether Doe was "ok" and if Doe "got in trouble."

**2. The Criminal Case**

The Commonwealth of Massachusetts filed an application for a criminal complaint against Doe, which the Boston Municipal Court issued on October 22, 2012. The complaint charged Doe with indecent assault and battery. He was arraigned that same day and pled not guilty. In February 2013, the tests of the samples taken from Doe's hand were completed, showing that Doe's hands were negative for traces of blood. The examiners did not test the samples for DNA, but preserved the swabs for possible DNA testing at a later date. During discovery, Doe produced a copy of the surveillance video from the ship that had been forensically enhanced and analyzed. In May 2014, the Commonwealth moved to dismiss the charges against Doe, and the court granted that motion.

**3. 2012 University Disciplinary Proceedings**

**a. Boston College's Disciplinary Procedures**

During the relevant time, B.C.'s written policy governing the investigation and adjudication of sexual assault accusations consisted of: (1) Section Four of the Student Guide (titled Community Standards and Policies); (2) Section Five of the Student Guide (titled Student Conduct System); and (3) the Conduct Board Procedure. The Office of the Dean of Students was tasked with "developing, disseminating, and upholding [the] behavioral standards that comprise the University Code of Student Conduct."

-5-

Additionally, "[t]he Student Conduct System [was] administered by the Vice President for Student Affairs through the Dean of Students and his/her staff."

These documents provided certain rights to students facing disciplinary proceedings. These rights included "access to a process through which to resolve deprivations of rights" and "a fair procedure which [was] appropriate to the circumstances." In the case of accusations of sexual harassment, sexual assault, or sexual misconduct, the school conducted a pre-hearing investigation of the allegations, which included "a review of statements obtained from either party, interviews with the complainant and the accused (if identified), interviews with appropriate witnesses, and a review of other relevant information."

Pursuant to B.C.'s procedures, a disciplinary complaint with the school could have proceeded concurrently with any criminal action. Still, the Office of the Dean of Students could have also decided to stay the disciplinary proceedings while the criminal matter was ongoing. Furthermore, the Student Guide provided that a student may be summarily suspended for certain conduct, including sexual assault. A summary suspension would have been followed, within a reasonable time, by a conduct hearing.

-6-

After a complaint was filed against a student, that student would meet with the Dean of Students or its designee to discuss the complaint. During this meeting, the University would decide whether the complaint should "be kept open for a later resolution, dropped, resolved, or referred to an appropriate hearing board."[1] If the complaint was referred to a board, the accused student would be provided with a copy of the referral, the Conduct Board Procedure, a written notification of the time and location of the hearing, the names of all the parties charged, the alleged violation, and name of the complainant.

Boston College's policies also provided for the composition of the Administrative Hearing Boards. According to Section Five of the Student Guide, those boards were "composed of three administrators, one faculty member or academic administrator and one student." All board members were trained by the Office of the Dean of Students. The Dean of Students designated the board's chairperson, and all board members were required to "disclose any real or perceived conflict of interest between themselves and any party."

The Student Guide and Conduct Board Procedures also detailed the hearing procedure. During conduct hearings, both the

---

[1] Either the Student Conduct Board or the Administrative Hearing Board.

-7-

complainant and the accused student could have an advisor with them.[2]  Both parties were "entitled to bring witnesses to the hearing."  However, witnesses would be limited to those who could "speak to the facts of the incident which they ha[d] witnessed."  The hearing would begin with the board's chairperson "reading the formal charges as determined by the Office of the Dean of Students."  Next the complainant would have the opportunity to read his or her incident report and further elaborate as needed.  The accused would be given the opportunity to respond, but could remain silent if he or she elected.  All board members would be allowed to question both parties "on all matters relevant to the complaint."  At the hearing's conclusion, both parties would be afforded the "opportunity to make a final statement to the hearing board."

Soon after the hearing, the board would meet in private to deliberate and "determine whether the accused [was] responsible or not for the charge(s), based upon a preponderance of the evidence."  The board could have reached one of the following determinations: (1) responsible; (2) not responsible; (3) no finding; or (4) responsible for a lesser included charge.  If the

---

[2]  The advisors, however, were not allowed to address the hearing board, but would have been able to confer with the student at any point during the hearing.

board concluded that an accused student was "responsible," it could recommend sanctions including suspension or dismissal from the University.

The University would then be required to send written notification of the board's determination to both parties within five days of the hearing. Either party could appeal the board's determination on two possible grounds: (1) demonstrated lack of fairness during the hearing; or (2) production of new evidence that would likely change the result of the hearing. Any appeal had to "be filed with the Dean [of Students] and the Vice President [for Student Affairs] within five business days after notification of the sanctions." The Dean of Students and the Vice President for Student Affairs would assess the appeal petition, and if they determined that it required consideration, it would be referred to the University's Appeals Board.

### b. Disciplinary Proceeding Against Doe

On the night of the alleged sexual assault, a B.C. police officer completed a Sexual Assault Notification Form describing A.B.'s allegations against Doe. B.C. immediately placed Doe on summary suspension. Doe's case was assigned to then Senior Associate Dean of Students, Carole Hughes ("Hughes"), who decided that the case should proceed to an administrative hearing board that would be convened within two weeks. B.C.'s Associate General

Counsel confirmed that the administrative hearing board would also act as the investigative body in Doe's case.

Hughes met with Doe and his parents on three occasions before the hearing. While the parties dispute whether Hughes allowed Doe to tell his version of the events during the first meeting, on October 24, 2012, they agree that Doe told Hughes on at least one occasion that he did not commit the alleged sexual assault, and that this was a case of mistaken identity. In that first meeting, Hughes informed Doe that he would be able to tell his account of the events to the hearing board. Doe was provided with the notice of the sexual assault charge and given the procedures for the investigation and hearing, but could only review -- though not have a copy of -- A.B.'s statement during these meetings.

Doe's hearing began on November 8, 2012. The Board was comprised of the chairperson, Catherine-Mary Rivera ("Rivera"), two other administrators, a law professor, and a student from the undergraduate program. The Board heard testimony from A.B., Doe, and three of Doe's friends who were on the ship on the night of the alleged sexual assault. A.B.'s testimony mirrored her prior statements. Doe denied having committed the sexual assault, produced the raw video surveillance from the dance floor of the ship, and testified about J.K.'s comment and subsequent text

messages.  Doe's friends testified that "they didn't see [Doe] bend down or do anything unusual."

The Board adjourned, and the hearing resumed on November 16, 2012.  On that day, both Betsy and J.K. testified. J.K. and his father had previously met with Hughes, who informed J.K. that he was required to attend the hearing, but was not being charged with anything, in an effort to put J.K. "at ease."  Betsy testified that she did not see the alleged sexual assault as it was taking place, and that Doe "stood out because he was tall" on the packed dance floor.  J.K. denied sexually assaulting A.B., claimed he was not intoxicated, and said he never apologized to Doe or said anything along the lines of "Sorry, dude, my bad." The Board refused to let Doe's private investigator, Kevin Mullen, testify about a phone conversation he listened to between Doe and J.K., or about Mullen's own interview with J.K., because Mullen had not been a witness of the alleged sexual assault.  Finally, the Board also rejected Doe's request to stay proceedings in anticipation of the results of the forensic tests, which had not yet been completed by the State Police.  Doe maintained that this evidence would exonerate him.

The Board deliberations took place at the end of the second day of hearings.  The Board failed to reach a decision on that day, a Friday, and decided to continue deliberations the

following week.  Over the weekend, Rivera told Hughes that the Board "was struggling" to reach a decision, and that as a result, "they were [considering] the possibility of a no finding."  Rivera then asked Hughes whether B.C. had ever issued a "no finding" determination before.  Hughes, in turn, contacted Paul Chebator ("Chebator"), then Dean of Students, who told Hughes that while B.C. had issued "no finding" determinations in the past, he "discourage[d] them."  Hughes conveyed this to Rivera prior to the Board's continuing deliberations on Monday, November 19.

On November 21, 2012, the Board found Doe responsible for the lesser offense of indecent assault and battery.  Doe's sanctions included his immediate suspension until January 6, 2014, dismissal from Boston College student housing, and loss of senior week privileges.  Doe promptly appealed the Board's decision, arguing a lack of due process and citing the Board's refusal to wait for the results of the forensic tests.  Chebator and Patrick J. Keating ("Keating"), then Executive Vice President of B.C. and Interim Vice President for Student Affairs, with input from B.C.'s General Counsel, Joseph Herlihy ("Herlihy"), and Rivera, reviewed Doe's appeal and crafted a response denying his appeal.  On December 7, 2012, B.C. notified Doe that his appeal had been denied.

## 4. 2014 B.C. Review

After serving his suspension, Doe returned to B.C. and graduated in May 2014. In September 2014, his parents, B.C. alumni themselves, wrote letters to B.C. President Father William Leahy ("Father Leahy") expressing their dissatisfaction with the 2012 disciplinary proceedings against Doe. In his letter, Doe's father stated that they had no "desire to file a lawsuit against [B.C.]" or any of the individuals who were involved in the 2012 disciplinary proceedings. In response, Father Leahy referred the Does to Barbara Jones ("Jones"), Vice President for Student Affairs, as "the right person at B.C. to review the case and make a recommendation" to the University's Executive Vice President on the matter.

After several communications with Doe's parents, Jones reviewed Doe's disciplinary proceedings to determine whether B.C. followed the adequate procedures, and whether there was new evidence that would change the outcome. Jones determined that B.C. had appropriately followed its procedures, which were "consistent with best practices in higher education," and that the new evidence the Does had brought forth in their communications to Father Leahy and Jones -- an enhanced analysis of the surveillance video from the ship, the results of the forensic tests, and the

results of a polygraph test -- did not justify reconsideration of Doe's case.

**B. Procedural History**

The Does initiated this action on March 11, 2015, claiming: (1) breach of contract for the 2012 disciplinary proceedings; (2) promissory estoppel; (3) breach of contract for the subsequent 2014 review; (4) breach of B.C.'s common law duty to ensure Doe's disciplinary process was conducted with basic fairness; (5) Title IX violations; (6) negligence; (7) negligent infliction of emotional distress; (8) intentional infliction of emotional distress; and (9) unjust enrichment. The Does requested declaratory relief that would, among other things, expunge the disciplinary proceedings from Doe's university records, a permanent injunction directing B.C. to comply with Title IX, and no less than three million dollars in compensatory damages. One year later, the Does moved to amend the complaint and add Herlihy as a new defendant.

All parties filed cross-motions for summary judgment. The Does moved for partial summary judgment on the claims for breach of contract for the 2012 disciplinary proceedings and breach of common law duty of basic fairness. B.C. and the individual defendants moved for summary judgment on all claims. After a hearing, the district court denied the Does' motion for partial

summary judgment and granted both B.C.'s and the individual defendants' motions for summary judgment.[3]  This timely appeal followed.

## II. **Standard of Review**

We review de novo a district court's decision to grant summary judgment.  Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah), 853 F.3d 618, 624 (1st Cir. 2017), cert. denied, 138 S. Ct. 639 (2018).  We do this while "drawing all reasonable inferences in favor of the non-moving party."  Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013) (citing Kuperman v. Wrenn, 645 F.3d 69, 73 (1st Cir. 2011)).  Our standard of review is unaltered when an appeal emerges from cross-motions for summary judgment.  See City of Springfield, 724 F.3d at 89; see also OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012).

Summary judgment is only proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material when it has potential of changing a case's outcome.  See Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017).  A

---

[3]  The district court also denied the Does' motion to amend the complaint.  The Does, however, do not raise this as an error in their appeal.

dispute is "genuine" when "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 352 (1st Cir. 1992) (citing United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)). And if there is a genuine dispute of a material fact, that dispute would "need[] to be resolved by a trier of fact." Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002).

### III. Discussion

The Does raise a number of challenges to the district court's grant of summary judgment on all their claims in favor of B.C. and the individual defendants. Let's begin.

### A. The Does' Breach of Contract Claim for 2012 the Disciplinary Proceedings

In reviewing a student's breach of contract claim against his or her university, we employ a reasonable expectations standard in interpreting the relevant contracts. See Walker v. President & Fellows of Harv. Coll., 840 F.3d 57, 61 (1st Cir. 2016). We must ask "what meaning the party making the manifestation, the university, should reasonably expect the other party[, the student,] to give it." Id. (quoting Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000)). In the context of disciplinary hearings, we "review the procedures followed to ensure that they fall within the range of reasonable expectations

-16-

of one reading the relevant rules." Cloud v. Trs. of Bos. Univ., 720 F.2d 721, 724-25 (1st Cir. 1983) (citing Lyons v. Salve Regina Coll., 565 F.2d 200, 202 (1st Cir. 1977)). "[I]f the facts show that the university has 'failed to meet [the student's] reasonable expectations'" the university has committed a breach. Walker, 840 F.3d at 61-62 (quoting Schaer, 735 N.E.2d at 378).

Below, the Does pointed to fifteen instances when B.C. allegedly breached the terms of their contractual agreement[4] and the fundamental fairness guarantees that B.C. makes to students facing disciplinary procedures. However, the Does only fully develop six of these alleged breaches in their appellate briefing.[5] Because we find that genuine disputes of material fact exist as to two of the alleged breaches, we hold the district court's grant of summary judgment as to the Does' breach of contract claim for the

---

[4] The parties do not dispute that a contractual relationship between Doe and B.C. arises from the Student Guide and the Conduct Board Procedure.

[5] The remaining nine alleged breaches are listed in their brief, but the Does explained that "space limitations" precluded them from briefing these breaches and point us to the arguments made below. We, however, deem that the Does have forfeited these nine arguments because "[f]iling a brief that merely adopts by reference a memorandum previously filed in the district court does not comply with the Federal Rules of Appellate Procedure." R.I. Dept. of Envtl. Mgmt. v. United States, 304 F.3d 31, 47 n.6 (1st Cir. 2002); see also Gilday v. Callahan, 59 F.3d 257, 273 n.23 (1st Cir. 1995). If the Does had felt that they required additional space to develop their arguments, they could have requested leave of court to file an enlarged brief.

2012 disciplinary proceedings was improper. We review each alleged breach preserved on appeal in turn.

## 1. Threshold Investigation

The Does first argue that pursuant to the Student Guide, B.C. was required to conduct a threshold investigation to discuss the complaint with Doe and, based on that discussion, decide on how to proceed with the complaint. The Does claim that Hughes's actions during their three meetings, where she failed to listen to Doe's account of the alleged sexual assault, and her decision to proceed with a disciplinary hearing even before meeting with Doe, breached the contract and prejudiced Doe. The Does' contention, however, is unpersuasive.

A complete reading of the Student Guide clarifies this issue. The Does point to language in Section Five that provides "[a] student who has had a complaint lodged against him . . . will be called by the Dean of Students or designee to discuss the complaint." From there, the document continues, "the case may be kept open for later resolution, dropped, resolved or referred to an appropriate hearing board as determined by the Dean." However, Section Five of the Student Guide does not end there. It also states that "[a] case may be referred directly to a Student Conduct Board or an Administrative Hearing Board if the Dean . . . feels that such a referral is appropriate." Therefore, when Section

Five is read as a whole, and under the standard of reasonable expectations, it does not create a reasonable expectation on any reader that a threshold evaluation would be required before any complaint is referred to either of the boards. Undoubtedly, the Dean of Students or designee must meet with a student who has a complaint lodged against him or her, but the Student Guide provides total discretion to said B.C. official to refer the case to a board before the meeting with an accused student to discuss the complaint. We need not dwell on this alleged breach any more, the language is unambiguous and "its purport may be determined as a matter of law." Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co., 214 F.3d 216, 220 (1st Cir. 2000). Since there is no threshold evaluation requirement, B.C. could not have breached its contract in this manner.

**2. Appropriateness of the Investigation**

The Does also argue that B.C. breached its contract by failing to conduct the required investigation of the alleged sexual assault. The Does' argument here is two-fold. First, they claim that B.C. "should have 'reasonably expected' a student to believe that allegations of sexual assault would be investigated by the [B.C.] Police before the University brought any charges against an accused student." They point to subsection five of Section Four of the Student Guide which states that "[t]he Boston College Police

-19-

[will] work cooperatively with the Office of the Dean of Students to investigate and resolve cases under this policy." According to the Does, it was the B.C. Police, who are trained to respond to sexual assault complaints, who were procedurally required to conduct an investigation after the "threshold evaluation." Alternatively, the Does contend that the language regarding the role of B.C. Police in the sexual assault procedures is at the very least ambiguous and summary judgment on this issue was improper. Secondly, the Does assert that there was no appropriate investigation because the Board could not be considered an adequate investigatory body in compliance with the terms of the Student Guide. The Board, the Does continue, lacked investigatory training and failed to wait for critical evidence.

"In interpreting contractual language, we consider the contract as a whole. Its meaning 'cannot be delineated by isolating words and interpreting them as though they stood alone.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 785 (1st Cir. 2011) (quoting Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004)). Once again, a complete reading of the Student Guide does not favor the Does' contentions. The language cited by the Does, found in subsection five of Section Four of the Student Guide, cannot be read in isolation. Subsection five concerns the procedural steps and services that the B.C. Police provides to students who might

choose to file a criminal complaint after suffering a sexual assault. In fact, the Student Guide clearly states that when an incident of sexual assault occurs off campus, B.C. Police's role is to assist "the victim in informing the appropriate municipal department if he or she so desires." Subsection four of Section Four of the Student Guide, on the other hand, covers the procedure for the filing of a complaint within the University. There, it states that "[t]he University will promptly conduct an investigation of the alleged incident." A thorough reading of the Student Guide could not raise a reasonable expectation to a student who's had a complaint filed against him or her based on an incident that occurred off campus that the B.C. Police would have any role beyond "assist[ing] the victim in informing the appropriate municipal police department." As there is no additional duty here, no breach of contract is possible under this theory.

The Does' second theory does not fare well either. Pursuant to the Student Guide, "[c]omplaints of sexual harassment . . . against a student member of the University community will be investigated and adjudicated in accordance with the Student Conduct System policies and procedures, as described in Section [Five]." In turn, Section Five states that the "function of the [disciplinary] proceedings is to investigate the facts . . . and determine responsibility for the alleged violation." (emphasis

added). Section Five contemplates two types of disciplinary proceedings: formal and informal hearings. While most complaints are resolved with informal hearings, known as administrative review/adjudication hearings, in some cases the complaint is referred to a Student Conduct Board or an Administrative Hearing Board for formal fact-finding and adjudication. The Student Guide's language is unambiguous: for any case referred to a board, that board will act as the investigatory body. Therefore, there was no breach of contract.

Lastly, the Does' contention that the Board lacked investigatory training and that it failed to wait for critical evidence is also unconvincing. The Student Guide did not require Administrative Hearing Board members to have any particular investigatory training in order to be part of the Board. Board members are, however, "trained by the Office of the Dean of Students" and the record shows that all members in the case at hand received this training before Doe's 2012 disciplinary proceedings. And, the Student Guide did not require the Board to wait for all evidence to become available before it could consider a disciplinary case and reach a decision. The Board here, however, considered that possibility and asked Doe and his advisor when the additional evidence would become available. Neither Doe nor his advisor could provide a definitive answer. In the end, the record

-22-

shows that the results of the forensic tests did not become available until February 2013. If the Board had decided to wait for the alleged critical evidence, the delay could have caused B.C. to breach its contractual obligation to "resolve the complaint within [sixty] days." Therefore, the Board's refusal to wait for the results of the forensic tests and an enhanced surveillance video[6] from the ship does not breach the contract.

### 3. Appropriateness of the Hearing Date

Next, the Does contend that B.C. breached its obligation to ensure that Doe had adequate time to prepare a response to the charges when Hughes decided that the case needed to be resolved quickly and rejected James's request for a stay of the University disciplinary proceedings while the criminal case was still ongoing. The Does argue that the district court's decision -- that B.C. had ultimate discretion on whether or not to stay the proceedings -- is incorrect, because while the language of the procedures states that the Dean "may" stay the process, that language has to be read in conjunction with B.C.'s other contractual obligations, which are to provide for due process and fundamental fairness. Taken together, the Does believe that the

---

[6] The record is not clear as to the date in which the enhanced surveillance video first became available. However, the enhanced video was presented to the Commonwealth in July 2013.

-23-

decision to proceed so quickly does not conform to a student's reasonable expectations and constitutes a breach of the overall bargain.

We disagree. One more time the Student Guide's language is dispositive. In relevant part Section Four of the Student Guide provides that when a complaint is filed "[t]he University will promptly conduct an investigation of the alleged incident . . . [and] make every reasonable effort to resolve the complaint within [sixty] days." Therefore, a student facing a complaint could reasonably expect that any disciplinary hearing would take place within those sixty days. And this reasonable expectation is not truncated by B.C.'s other contractual obligations to provide due process and fundamental fairness since Doe had written notice of the charges, opportunity to discuss the charges with counsel and have counsel present as an advisor during the disciplinary proceedings, and enough time to present witnesses. See Cloud, 720 F.2d at 724, 726 (finding that due process and basic fairness were followed when accused student had counsel and opportunity to present witnesses).

The same goes with the Does' argument regarding B.C.'s refusal to stay University disciplinary proceedings while Doe's criminal case was still pending. While the Student Guide provides to the Dean of Students the possibility of staying Boston College's

-24-

disciplinary process "if a student is summarily suspended and the criminal matter remains open," "the university conduct process will normally proceed while the criminal action is in process." Accordingly, B.C. did not breach the contract by pursuing to resolve the complaint filed against Doe within sixty days and concurrently to the criminal case, as provided in the Student Guide.

### 4. Board Members' Impartiality

The Student Guide requires that Administrative Hearing Board members "disclose any real or perceived conflict of interest between themselves and any party and may not hear a case if they are not able to be impartial in the hearing of the case." The Does claim that B.C. breached its contract because the Board was not impartial, mainly due to certain actions by the Board's chair, Rivera.[7] The Does argue that Rivera's tone towards Doe during the disciplinary proceedings was evidence of bias and a breach of the impartiality requirement in the Student Guide. The Does point to

_____

[7] The Does also argue, without much elaboration and in a footnote, that there were some "related breach concerns" regarding Hughes's alleged failure to ensure there were no conflicts of interests by any of the Board's members and an alleged undisclosed conflict of interest by one of the Board members. This argument, however, is deemed waived. Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st Cir. 1999) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived.").

their own testimony in order to describe Rivera's tone as openly hostile, aggressive biased, and dismissive.

The Does contend that the district court erred when it made improper factfinding and credibility determinations when it decided that Rivera was not biased towards Doe, rejecting the evidence provided as "subjective impressions." They argue that this is contrary to Burns v. Johnson, 829 F.3d 1, 12-13 (1st Cir. 2016) (citing United States v. Flores-Rivera, 787 F.3d 1, 28 (1st Cir. 2015) ("Personal knowledge can include inferences and opinions, so long as they are grounded in personal observations and experiences.")).

"Nevertheless, it has been noted that '[a]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences.'" Gorman v. Univ. of R.I., 837 F.2d 7, 15 (1st Cir. 1988) (quoting Duke v. N. Tex. State Univ., 469 F.2d 829, 834 (5th Cir. 1972)). In reviewing schools' disciplinary procedures, "a presumption [of impartiality] favors the administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut this presumption." Id. See also Nash v. Auburn Univ., 812 F.2d 655, 665 (11th Cir. 1987) ("Any alleged prejudice on the part of the board must be evident from the record and cannot be based in speculation or inference."); Ikpeazu v. Univ. of Neb., 775 F.2d

-26-

250, 254 (8th Cir. 1985) ("[W]e observe that the committee members are entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven.").

The Does do not meet their burden of proof. We have recognized before that observations about a defendant's tone based on perception are not mere speculation, "so long as they are grounded in personal . . . experiences." Burns, 829 F.3d at 12–13 (citing Flores-Rivera, 787 F.3d at 28). However, after giving credit to the Does' version of the facts, the statements accredited to Rivera fail to rebut the Board's impartiality presumption.

According to the Does, Rivera acted with an attitude towards Doe and asked questions to either him or his witnesses that Doe would qualify as "cross-examination," while subjecting other witnesses to only "softball" questions. Still, considering Rivera's role as the chairperson of the Board, in charge of managing the flow of the hearing and leading the questioning of the witnesses, the Does statements, without more, are not legally sufficient to overcome the Board's impartiality presumption, particularly when an examination of the record fails to reveal any other evidence of bias showing that the Board was either prejudiced or partial against Doe. Cf. United States v. DeCologero, 530 F.3d 36, 56 (1st Cir. 2008) (quoting Liteky v. United States, 510 U.S.

540, 555-56 (1994)) ("[R]emarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."). Thus, we find no breach of contract by B.C. under this theory.

**5. Adequacy of the Board's Training**

As briefly mentioned before, the Student Guide also provides that "[a]ll board members [of an Administrative Hearing Board] are trained by the Office of the Dean of Students. Chairpersons for the Administrative Hearing Board are designated by the Dean of Students and receive additional training." As the district court correctly held, under the reasonable expectations standard, "a student would accord to this contractual provision . . . that members of any university hearing board would not only receive training but that training would be adequate to resolve the disputes that came before those members." Doe v. Trs. of Bos. Coll., No. 15-CV-10790, 2016 WL 5799297, at *17. (D. Mass. Oct. 4, 2016).

The Does contend that B.C. breached this contract requirement by failing to ensure that the Board members were properly trained. The Does rely on Chebator's awareness of a report issued by B.C. on April 23, 2012, which concluded that B.C.'s sexual assault trainings for Hearing Board members were

-28-

insufficient according to "best practices." According to the Does, this alleged admission and the lack of any evidence in the record that would show that B.C.'s training practices changed or improved before Doe's disciplinary procedures, should be enough to grant summary judgment in their favor. In any case, the Does claim that there is enough dispute as to the adequacy of the Board members' training to give rise to a jury question.

We, however, disagree. The record before us does provide evidence that B.C. took remedial steps in response to the April 23, 2012 report. Chebator testified that in response to the report, B.C. "ramp[ed] up the training for individuals who would be hearing sexual assault cases" by developing "a secondary training for those individuals who would be sitting on administrative hearing boards involving sexual assault matters." And, as discussed above, the record also shows that all Board members in the case at hand received this training before Doe's 2012 disciplinary proceedings, and after the remedial steps were implemented.[8] We, therefore, agree with the district court's ruling that, given B.C.'s response

_____

[8] In fact, all but one of the Board members recognized during their depositions a document marked as deposition Exhibit No. 105, which contained an agenda for the Administrative Hearing Board, Organizational Meeting, held on October 3, 2012. They all recognized that as part of this training session they were trained in Title IX issues by the Massachusetts District Attorneys' Office.

-29-

to the April 23, 2012 report, B.C. did not breach its contractual obligation to adequately train the members of the Board.

## 6. Interference with the Board

### a. Deliberations

The Does posit that pursuant to the Student Guide, B.C. was required to ensure the independence and integrity of the Board's deliberations without outside interference. Specifically, the Does point to the Student Guide's requirement that the Board meet "in private" and that its final decision be impartial. The Does argue that B.C. breached this commitment when Hughes transmitted Chebator's discouragement of a "no finding" result to Rivera during the weekend between the Board's two deliberation sessions. That interference, they argue, were it to have happened during court proceedings, would be "deemed presumptively prejudicial." Remmer v. United States, 347 U.S. 227, 229 (1954). At the very least, the Does claim, there is a factual dispute as to whether there was an interference with the Board's deliberations, and the district court should not have granted summary judgment.

Boston College, on the other hand, argues that the Board's independence was not compromised. Regarding Hughes's relaying of Chebator's "discouragement" remark, B.C. states that there is no evidence that the Board was influenced in any way by

this comment.  In B.C.'s view, Chebator's comment was not a suggestion that the Board should make a finding of "responsible," but merely that it would be better if the Board made some finding.

A review of the record reveals that summary judgment on this issue was inappropriate.  Let's briefly recap Chebator's indirect interaction with Rivera, the designated chairperson of the Board.

On Friday, soon after completing the second day of hearings in Doe's case, the Board began deliberations.  However, by the end of the day the Board had not reached a result.  At around 10:48p.m., Rivera responded to an email from Hughes inquiring about the status of the Board's deliberations.  In her email, Hughes had asked if she should assume that the Board had not reached a result.  Rivera replied, "Yes you can say that.  We def [sic] won't have it by noon on Monday.  We were all drained.  Struggling with needing to see the other evidence, but know we can't wait for weeks or months.  It is not a clear yes for responsible."  Rivera then informed Hughes that the Board would think about the case over the weekend and continue deliberations on the coming Monday.  Rivera's email closed with, "[w]e are going on the notion not to have 'no finding.'"

Over the weekend,[9] Rivera contacted Hughes again, this time over the phone. According to Hughes, Rivera asked her if the University had issued a "no finding" result in the past. Hughes did not know the answer, and decided to ask her immediate superior, Chebator. Chebator's response was that indeed there had been "no finding" determinations in the past, but that he discouraged them. After Hughes's conversation with Chebator, but before Monday -- when the Board would meet once more to continue deliberations -- Hughes called Rivera and told her that Chebator confirmed that previous cases had concluded with "no finding," but that he "discouraged it."

While none of the other Board members recall hearing about Chebator's comment, the parties do not dispute that the comment reached Rivera before the second day of deliberations.[10] And, while B.C.'s written policies and procedures are silent as to who leads the Board's deliberations, the record indicates that

_____

[9]  The record is not clear as to whether these conversations occurred Saturday or Sunday.

[10]  During her deposition Rivera testified that by "Friday, and by Monday, everybody was unanimous that they felt that [Doe] was responsible for what we believe was inappropriate touching of the buttocks." However, other parts of the record show that all but one of the other Board members testified that even though a "soft vote" was taken on Friday, they did not reach a decision on the first day of deliberations.

Rivera, as appointed chairperson of the Board, was the one leading it.

At the summary judgment stage, a trial court is to make legal determinations rather than involve itself in factfinding. See United Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir. 1995). The record here, viewed in the light most favorable to the Does, necessarily bars summary judgment for this alleged breach of contract claim. Under the standard of reasonable expectations, it is reasonable for a student to expect that the B.C. Student Guide's language stating that "[t]he Board will meet in private to determine whether the accused is responsible or not[,]" means exclusion of outside influences in the Board's deliberations. Furthermore, during oral argument, B.C.'s counsel agreed that B.C. is required to conduct disciplinary proceedings with basic fairness. In this context, conducting these proceedings with basic fairness excludes having an associate Dean of Students tell the Board Chair in the middle of deliberations that one of the verdict options favorable to the student ("no finding") was discouraged by the Dean of Students.

Whether or not Rivera's communications with B.C. administrators, while deliberations where still ongoing, inappropriately interfered with the Board's decision on the sexual assault complaint against Doe, and breached Doe's reasonable

-33-

expectation that the Board would meet in private, is a material fact with regard to the Does' breach of contract claim. Because a reasonable jury could resolve this dispute in favor of the Does, the dispute is genuine and summary judgment inappropriate.

### b. Alternative Culprit Defense

The Does also argue that the district court erred when it allegedly disregarded the way Hughes handled Doe's alternative culprit defense.[11] According to the Does, Hughes's conduct was prejudicial to Doe since Hughes, through a subordinate, instructed Rivera that the Board should put J.K. "at ease." This, the Does conclude, is an indication that J.K. received special treatment and, thus, Doe's case was not "fairly considered" by the Board.

Just like it is reasonable for a student to expect that a school's basic fairness guarantee excludes outside influences in the Board's deliberations, it is also reasonable for a student to expect that a basic fairness guarantee excludes having an associate Dean of Students request Board members to give special treatment to the prime alternative culprit in a case in which the key defense is that someone other than the accused student committed the alleged sexual assault. On Sunday, November 11, 2012, after the

---

[11] Although the Does raise this claim principally in challenging B.C.'s failure to conduct a threshold evaluation of the situation, we think that it fits more comfortably under the heading of "Interference with the Board."

first day of Doe's disciplinary hearing, Hughes emailed a summary of several steps taken as to Doe's case to Herlihy and a subordinate employee from B.C.'s Office of the Dean of Students. Regarding J.K., Hughes wrote: "I was very clear with J.K. that he was coming as a witness and was not being charged with anything. I think it might be good to talk to [Rivera] about how the [B]oard might also put him at ease." The phrase "at ease" may encompass many accommodations, and that phrase is nowhere defined in the summary judgment record.

Doe's disciplinary hearing continued on November 16, 2012, (the day in which J.K. testified). Whether or not Hughes's directive to her subordinate about talking to Rivera on how the Board might put J.K. at ease breached Doe's reasonable expectation that B.C. would provide him "a fair procedure" is, on this opaque record, a material fact with regard to the Does' breach of contract claim that should be resolved by the jury. We therefore vacate the district court's grant of summary judgment on the Does' breach of contract claim for the 2012 disciplinary proceeding and remand for further proceedings consistent with this opinion.

## B. Basic Fairness Claim

Next, the Does bring forth a basic fairness claim in which they argue that B.C.'s alleged breaches of contract, either all together or any one of them independently, breached B.C.'s

-35-

obligation to provide a fundamentally fair disciplinary process to Doe. The Does contend that B.C.'s basic fairness obligation is rooted in two independent sources: (1) the Student Guide itself, which provides that B.C.'s disciplinary process "exists to protect the rights of the Boston College community and assure fundamental fairness to complainants and to students accused of any breach of the University Code of Student Conduct," and (2) an independent duty to conduct disciplinary procedures with basic fairness imposed by Massachusetts law.

We agree with the Does that the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school disciplinary proceedings, creates an independent duty to provide basic fairness. See Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004). In Coveney v. President & Trs. of Coll. of Holy Cross, the Massachusetts Supreme Judicial Court ("SJC") recognized that even where a student does not have a contractual right to a disciplinary hearing, if a school does hold a hearing, the school has a duty to conduct it with basic fairness. See Cloud, 720 F.2d at 725 n.2 (citing Coveney, 445 N.E.2d 136, 139 (Mass. 1983)) ("[W]hen a hearing is held, it must be conducted fairly."). However, whenever a school expressly promises no less than basic fairness, which is the case here, the school's implied duty becomes

superfluous and the court's analysis to ensure that the disciplinary proceedings were "conducted with basic fairness," Cloud, 720 F.2d at 725, focuses on assuring compliance with the express contractual promise.

The district court's grant of summary judgment on the Does' claim for basic fairness rested on its analysis as to the Does' breach of contract claim. Trs. of Bos. Coll., 2016 WL 5799297, at *23. Because there are genuine issues of material fact on the Does' breach of contract claim for the 2012 disciplinary proceedings, as discussed above, summary judgment on the Does' basic fairness claim was also inappropriate. Therefore we also vacate and remand on this issue.

**C. The Does' Breach of Contract Claim for the 2014 Review**

In their complaint, the Does allege that the written communications they exchanged with Father Leahy in 2014 (two letters sent by Doe's parents and a couple of e-mails exchanged between James and Father Leahy) formed a binding contract between B.C. and the Does, which required B.C. to conduct an independent review of the 2012 disciplinary proceedings. They allege that B.C. breached this contract because the 2014 review was "anything but" independent.

The Does contend that these communications satisfied all the elements of a valid contract. That is, that there was an

offer, acceptance, and consideration, resulting in each party having obligations. In exchange for Father Leahy's offer for an independent review, the Does allege that they forbore the pursuit of legal action against B.C., serving as the consideration in the contract formation. Lastly, the Does point to Massachusetts case law to support their contention that a contract was formed, even though not all terms had been precisely identified. See Situation Mgmt. Sys., Inc. v. Malouf, Inc., 724 N.E.2d 699, 703 (Mass. 2000). Alternatively, the Does contend that any dispute as to whether or not a contract was formed should be resolved by a jury, and not on summary judgment.

Boston College counters that the Does' breach of contract claim for the 2014 review fails for two reasons. One, they argue that the aforementioned written exchange failed to meet the basic elements of contract formation, meaning there was no contract to be breached by B.C. In particular, they point to the lack of any manifest intention by Father Leahy to be bound by any particular terms of an agreement. Two, B.C. maintains that even if the Court were to assume that an enforceable contract existed, the Does cannot identify any specific failure or omissions by B.C. that would constitute a breach. B.C. contends that the Does' disagreement with Jones's conclusion in her review is not a triable issue of fact regarding a breach of any agreement.

"Although the question of contract formation is typically a question for the factfinder, and would thus be subject to clear error review, where 'the evidentiary foundation for determining the formation of the parties' contract [is] either undisputed or consist[s] of writings,' contract formation is instead a question of law for the court." TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 (1st Cir. 2007) (citation omitted) (quoting Lambert v. Kysar, 983 F.2d 1110, 1114 n.4 (1st Cir. 1993)). Here, we find ourselves in the latter situation.

The essential elements for the formation of a contract under Massachusetts law consist of an offer, acceptance, and consideration. See Quinn v. State Ethics Comm'n, 516 N.E.2d 124, 127 (Mass. 1987). In particular, the SJC has explained that in determining whether an enforceable contract has been created "there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." Lambert v. Fleet Nat. Bank, 865 N.E.2d 1091, 1095 (Mass. 2007) (quoting Situation Mgmt. Sys., Inc., 724 N.E.2d at 703). Not all terms of an agreement must be "precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." Situation Mgmt. Sys., Inc. 724 N.E.2d at 703.

As to the element of consideration, "the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 201 (1st Cir. 2004) (citing Hinchey v. NYNEX Corp., 144 F.3d 134, 142 (1st Cir. 1998)). And while "abandonment of a claim believed to be well founded . . . is the surrender of a thing of value and is a sufficient consideration for a contract," Blair v. Cifrino, 247 N.E.2d 373, 375 (Mass. 1969) (quotations and citations omitted), the "[m]ere forbearance to sue a claim, without any promise either in express terms or by fair implication from all of the circumstances, does not form sufficient consideration." Merrimac Chem. Co. v. Moore, 181 N.E. 219, 222 (Mass. 1932).

Even with all reasonable inferences resolved in favor of the Does, we cannot conclude that their 2014 written communications with Father Leahy created a binding contract. A complete reading of the record validates our conclusion. It is true that James informed Father Leahy, though somewhat indirectly, that the Does were prepared to "file a lawsuit against [B.C.]," in order to correct the alleged injustice. Yet nothing in the record shows that the Does expressed any willingness to forego their right to file that lawsuit. While it is true that the forbearance of one's right to sue may be implied under certain circumstances, see id.,

-40-

Father Leahy's response to the Does' letters was limited to a suggestion that James contact B.C.'s Vice President for Student Affairs. Nothing in the record hints Father Leahy's suggestion was a contractual offer or promise made to persuade the Does to abandon a possible lawsuit. Cf. Neuhoff, 370 F.3d at 202 (finding that a retail promise was not given to induce the abandonment of a lawsuit).

Because there was no consideration, no enforceable contract was formed from the written communications between the Does and Father Leahy. Therefore, we affirm the district court's grant of summary judgment in favor of B.C. as to the Does' breach of contract claim for the 2014 review.

## D. Title IX Claims

Next, the Does challenge the district court's summary judgment dismissal of their Title IX claims. In their complaint, the Does pursued Title IX discrimination claims for erroneous outcome based on gender bias and deliberate indifference. We consider them in turn.

### 1. Erroneous Outcome based on Gender Bias

Title IX provides that "[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This provision is

enforceable "through an implied private right of action." Gebser

v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 281 (1998) (citing

Cannon v. Univ. of Chi., 441 U.S. 677, 717 (1979)). The Does'

Title IX claims rest on challenging B.C.'s disciplinary procedures

as discriminatory. Neither the Supreme Court nor this Circuit have

adopted a framework for analyzing claims by students challenging

a university's disciplinary procedures as discriminatory under

Title IX. We need not establish one at this moment. The parties

agree that the applicable standard for the Does' Title IX claim

challenging B.C.'s disciplinary procedures on erroneous outcome

grounds requires that a plaintiff offer evidence "cast[ing] some

articulable doubt on the accuracy of the outcome of the

disciplinary proceeding," and indicating that "gender bias was a

motivating factor."[12] Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d

Cir. 1994).[13]

---

[12] We note that the Sixth Circuit has also consistently applied
this same standard when facing Title IX claims under the theory of
erroneous outcome. See Doe v. Miami Univ., 882 F.3d 579, 592 (6th
Cir. 2018) (applying the same criteria as Yusuf for a Title IX
erroneous outcome claim to reverse the district court's grant of
a motion to dismiss for failure to state a claim); Doe v. Cummins,
662 F. App'x 437, 451-52 (6th Cir. 2016) (applying the same
criteria for a Title IX erroneous outcome claim to affirm the
district court's grant of a motion to dismiss under Fed. R. Civ.
P. 12(b)(6)); Mallory v. Ohio Univ., 76 F. App'x 634, 638-39 (6th
Cir. 2003) (applying the same criteria for a Title IX erroneous
outcome claim to affirm the district court's grant of a summary
judgment).

[13] We also note that the Second Circuit recently held that "the

-42-

The Does argue that the record contains sufficient evidence to support their erroneous outcome claim that B.C.'s procedures were infected with gender bias.[14]  Their argument is threefold.  First, they contend that B.C.'s procedures are infected with systemic gender bias.  This is so, they say, despite the fact that the University's statistics show that, since 2005, ten of thirty-two students accused of sexual assault were not found responsible in their disciplinary proceedings.  Even though these

_____

temporary presumption afforded to plaintiffs in employment discrimination cases under Title VII applies to sex discrimination plaintiffs under Title IX as well."  Doe v. Columbia Univ., 831 F.3d 46, 56 (2d Cir. 2016).  But see Miami Univ., 882 F.3d at 589 (declining to follow the Second Circuit's reasoning for extending Title VII's temporary presumption to Title IX sex discrimination plaintiffs because of differing Sixth Circuit precedent regarding the pleading standard under Title VII).  We take no position as to whether such a presumption applies to Title IX claims because even if it did, it would not affect the outcome of this case.

[14]  The Does also allege in their brief that the district court misapplied the "[s]tandard in evaluating the [e]vidence of [g]ender [b]ias" because it "improperly placed the burden on [Doe] to 'provide "statements by members of the disciplinary tribunal" or "statements by pertinent university officials" that demonstrate the improper influence of gender on the proceedings.'"  Because we review de novo the district court's grant of summary judgment, this argument is immaterial.  However, the Does misstate and misquote the district court's ruling on this matter.  In its memorandum and order, the district court did not require Doe to offer direct proof of gender bias, but instead ruled that, to answer the question of "whether the college's actions were motivated by gender bias," a plaintiff "can . . . show[] [this] via statements by members of the disciplinary tribunal."  Trs. of Bos. Coll., 2016 WL 5799297, at *24 (emphasis added) (internal citation omitted).

-43-

statistics might suggest that B.C.'s proceedings are not infected with gender bias, the Does claim that it is a pervasive belief at B.C. that accusers are always female and perpetrators are always male, and this belief infects all proceedings with gender bias. This systemic gender bias, the Does continue, is confirmed by the terminology B.C. employs in its written policies and procedures: accusers are branded "victims" or "victims/survivors," while an accused student is labeled a "perpetrator." Together, they argue, these facts show a systemic gender bias against accused males.

Next, the Does maintain that gender bias played a role in B.C.'s procedures because B.C. administrators were influenced by outside pressure. Specifically, the Does point to pressure exerted by the U.S. Department of Education and its Office of Civil Rights's April 2011 "Dear Colleague" Letter, which tied federal funding for private colleges to their compliance with certain requirements for handling sexual harassment and sexual violence on their campuses.[15] Lastly, the Does assert that there is enough evidence to prove that there was a "pattern of decision-making" in Doe's case in which gender bias was the motivating factor. First, the Does claim that the Commonwealth's decision to dismiss the

---

[15] See "Dear Colleague" Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

criminal charges against Doe serves as evidence of his innocence. Second, they list several occurrences which allegedly show a "pattern of decision-making" explained solely by gender bias, including inter alia: (1) Hughes's treatment of and contempt towards Doe; (2) Hughes and Chebator's interference with the Board by "discouraging" a "no finding" result; (3) the Board's refusal to wait for the results of the forensic tests; and (4) the presumption of Doe's guilt.[16]

On the other hand, B.C. contends that the Does' erroneous outcome claim fails because they have been unable to produce any evidence that would suggest gender bias by the B.C. administrators or any of the decision makers involved in Doe's disciplinary proceedings, or that the outcome of Doe's disciplinary proceeding was influenced by gender bias. Nor is there evidence that B.C. was influenced by external pressures. Therefore, gender bias could not have been a motivating factor in the disciplinary decision.

_____

[16] The Does also allege that the failure to reverse the outcome of Doe's 2012 disciplinary proceedings could only be explained by gender bias. This argument lacks any meaningful development and should therefore be deemed waived, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), and it is also unfounded since they do not offer any evidence that Jones, who conducted the review, was motivated by gender bias.

To succeed on their erroneous outcome claim, the Does must offer evidence (1) that would "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) show "gender bias was a motivating factor." Yusuf, 35 F.3d at 715. The Does fail on the second prong.

Even assuming that the Dean's interference with the Board's deliberations cast some articulable doubt on the outcome, none of the arguments put forth by the Does -- or evidence which they point us to -- tend to show that there was a causal connection between the outcome of Doe's disciplinary proceedings and gender bias. To show this causal link, the Does cannot merely rest on superficial assertions of discrimination, but must establish that "particular circumstances suggest[] that gender bias was a motivating factor." Id.

First, we are unmoved by the Does' contention that B.C.'s procedures are infected with a systemic gender bias based on the fact that between August 1, 2005 and July 1, 2015, only male students have been accused of sexual assault. It is unreasonable to draw such an inference from this information rather than recognize that other non-biased reasons may support the gender makeup of the sexual misconduct cases at B.C. See Cummins, 662 F. App'x at 453-54. The gender of the students accused of sexual assault is the result of what is reported to the University, and

not the other way around.  Furthermore, the language used in B.C.'s written procedures is, on its face, gender neutral.  The procedures make no mention of men or women but rather use terms like "victim," "survivor," "alleged perpetrator," "complainant," or "accused student."[17]  Actually, throughout the Student Guide, both victims and the accused are referred to as "he or she," indicating that B.C. believes that men and women can both be victims and perpetrators.  The Does have pointed to no circumstantial evidence, other that the statistics of male accused students and the language in the Student Guide, that would suggest that gender bias played a role in the outcome of the proceedings in this case.  As this case comes to us on a motion for summary judgment, after the parties have engaged in substantial discovery, a complete lack of evidence -- whether direct or circumstantial -- will not allow a party to survive a motion for summary judgment. Conclusory allegations are not enough.

Secondly, while the Does may rely on circumstantial evidence alone to prove that there was a discriminatory pattern of decision-making, see Burns, 829 F.3d at 8 (holding that a plaintiff

_____

[17]  While subsection five of Section Four of the Student Guide makes one reference to "female victims/survivors," it is to guarantee the female students the right to have a female officer present during interviews with the B.C. Police.  This reference to "female student" does not illustrate gender bias.

may rely on circumstantial evidence to prove sex discrimination under Title VII),[18] none of the circumstances of Doe's disciplinary proceedings indicate that gender bias was a "motivating factor" behind the Board's determination. In fact, the record contains gender-neutral explanations for the outcome of Doe's case -- mainly that the Board concluded that there was enough evidence to support its finding.[19] While we remand this case as to the Does' breach of contract claim for the 2012 disciplinary proceedings because we have found that there is a dispute regarding whether there was any inappropriate interference with the Board's decision, the record does not show that even if there was an interference, gender bias was a motivating factor. See supra III.A.I.6.a.

Finally, the Does' argument that B.C. administrators were influenced by outside pressure, in particular the U.S. Department of Education's April 2011 "Dear Colleague" Letter, is both conclusory and meritless. The Does have not explained how

---

[18] We may turn to Title VII for guidance on Title IX claims. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir. 2002) (citing Wills v. Brown Univ., 184 F.3d 20, 25 n.3 (1st Cir. 1999)).

[19] The record shows that Board Members: (1) understood that their finding had to be grounded on the preponderance of the evidence; (2) knew that Doe did not have the burden to prove his innocence; (3) discussed all the evidence presented during the hearings; (4) felt that there was enough evidence to support a finding; and (5) found that Doe had committed the sexual assault by touching A.B.'s buttocks.

the Dear Colleague Letter reflects or espouses gender bias. This necessarily dooms their argument that the Letter somehow infected the proceedings at issue here with gender bias. More than "conclusory allegations, improbable inferences, and unsupported speculation" is required to defeat summary judgment. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) (citations omitted).

Accordingly, we affirm the district court's grant of summary judgment in favor of B.C. as to the Does' Title IX erroneous outcome claim.

### 2. Deliberate Indifference

To succeed on a Title IX deliberate indifference claim, a plaintiff must show that an official with authority to implement corrective measures was aware of and deliberately indifferent to an act of discrimination on the basis of sex. See Gebser, 524 U.S. at 277. "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." Porto v. Town of Tewksbury, 488 F.3d 67, 72 (1st Cir. 2007) (quoting Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 645 (1999)). The discriminatory act must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. (quoting Davis, 526 U.S. at 650).

We need not delve too deeply into this issue since the Does' arguments here rely on their unsuccessful Title IX erroneous outcome claim. The Does contend that gender bias was a motivating factor in the outcome of Doe's disciplinary proceedings and then again during B.C.'s 2014 review, that this amounted to an act of sex discrimination, and that B.C. officials deliberately ignored it. Regarding Doe's disciplinary proceedings, the Does allege that Chebator knew back in 2012 that B.C.'s training of hearing boards was insufficient, and that deficiency was never corrected, meaning that he was aware that the Board in Doe's case was insufficiently trained. Concerning B.C.'s 2014 review, the Does argue that James and Mary's letters informed Father Leahy, Jones, and Herlihy, of the gender-biased misconduct in Doe's disciplinary proceedings, but that these B.C. officials, collectively and individually, decided not to address it.

While the Does successfully show that B.C. officials were on notice of their allegation that Doe's disciplinary proceedings produced an erroneous outcome because it was influenced by gender bias, the Does' Title IX deliberate indifference claim is unsuccessful. Their claim fails for the same reasons that we discussed above: they are unable show that any of the particular circumstances that allegedly contributed to an erroneous outcome were motivated by gender bias. See supra

III.D.1. Without underlying acts of discrimination, there can be no Title IX deliberate indifference claim. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam) (holding that, in suits brought under 42 U.S.C. § 1983, an underlying constitutional violation by officers is necessary for a successful municipal liability claim); see also Evans v. Avery, 100 F.3d 1033, 1039-40 (1st Cir. 1996) (following Heller in the context of a liability claim on a theory of deliberate indifference). Therefore, we affirm the district court's grant of summary judgment in favor of B.C. as to the Does' Title IX deliberate indifference claim.

**E. Negligence Claims**

The Does also argue that the district court erred in dismissing their negligence claims and holding that neither B.C. nor any of the individual defendants owed them a duty of care. Under Massachusetts law, "[w]hether or not a duty of care existed is a question of law for the court." Gorfinkle v. U.S. Airways, Inc., 431 F.3d 19, 23 (1st Cir. 2005) (citing O'Sullivan v. Shaw, 726 N.E.2d 951, 954 (Mass. 2000)). Such a duty could find its source either in "existing social values and customs" or where it has been "voluntarily assumed" by a defendant. Mullins v. Pine Manor Coll., 449 N.E.2d 331, 335-336 (Mass. 1983) (quoting Schofield v. Merrill, 435 N.E.2d 339, 341 (Mass. 1982) and citing Black v. N.Y., N.H., & H.R. Co., 79 N.E. 797, 798 (Mass. 1907)).

The Does argued below that once the University placed Doe under the student disciplinary process, B.C. and the individual defendants owed Doe an independent duty to conduct such disciplinary process with due care. It is the Does' contention that B.C. voluntarily assumed this duty when it accepted federal funds and followed Title IX's regulations regarding sexual assault, which created the risk that Doe could be wrongfully branded as a perpetrator of sexual assault for the rest of his life.

We, however, do not find that B.C. or the individual defendants owed the Does any independent duty of care in this context. As explained earlier, in the context of school disciplinary hearings, the court's duty is to "review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules." Cloud, 720 F.2d at 724-25. In turn, "[w]e also examine the hearing to ensure that it was conducted with basic fairness." Id. at 725. When an "alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent, then contract law should be the only theory upon which liability would be imposed." Treadwell v. John Hancock Mut. Life Ins. Co., 666 F. Supp. 278, 289 (D. Mass. 1987) (citing W. Prosser & W. Keeton, Torts § 92, at 656 (5th ed. 1984)). Neither party disputes that

the contractual relationship between Doe and B.C. arises from the Student Guide and the Conduct Board Procedure, and that these documents prescribe the disciplinary process. Because it is clear that Doe's disciplinary proceedings arose from this contractual relationship, we hold that B.C. did not owe the Does any additional independent duty outside of their existing contractual relationship. Any remedy for a breach of this contractual obligation must sound in contract, not in tort.

When Massachusetts courts have recognized certain legal duties imposed on universities through their "voluntary assumption" of care, they have done so narrowly. See Nguyen v. Mass. Inst. of Tech., 96 N.E.3d 128, 140-41 (Mass. 2018) (discussing the modern university-student relationship in Massachusetts tort law); Mullins, 449 N.E.2d at 336 (finding that a college undertook a duty to protect students against foreseeable criminal acts of third parties because the school charged students a dormitory fee for this service) (emphasis added).; Bash v. Clark Univ., No. 06745A, 2006 WL 4114297, at *4-5 (Mass. Super. Ct. Nov. 20, 2006) (finding no duty to protect a student from voluntary consumption of illegal drugs because of Mullins's foreseeability requirement); Doe v. Westlake Acad., No. 97-cv-2187, 2000 WL 1724887, at *7 (Mass. Super. Ct. Nov. 21, 2000) (explaining the foreseeability limitation of a University's duty of care under the

student-university special relationship); <u>Erickson</u> v. <u>Tsutsumi</u>, No. CA199801842B, 2000 WL 1299515, at *2 (Mass. Super. Ct. May 17, 2000) (recognizing that <u>Mullins</u> limited its holding to situation in which a duty of care is traditionally imposed). As there are specific rules governing student disciplinary proceedings under the existing contractual relationship between Doe and B.C., and given Massachusetts courts' narrow construction of the scope of a university's voluntary assumption of care, expanding it here would be inappropriate.

As to the individual defendants, the Massachusetts Supreme Judicial Court has held that "[a]bsent a legal duty, there can be no personal liability." <u>Lyon</u> v. <u>Morphew</u>, 678 N.E.2d 1306, 1309 (Mass. 1997). Because B.C. did not owe the Does any independent duty outside of their existing contractual relationship, an inquiry as to the individual defendants' negligence becomes irrelevant. <u>See</u> <u>Lev</u> v. <u>Beverly Enters.-Mass., Inc.</u>, 929 N.E.2d 303, 313 (Mass. 2010) (explaining that violations of policies do not create a duty of care in individual defendants and are only relevant to the negligence inquiry after a duty of care has been established).

Because we cannot find an independent duty outside of the contractual relationship between the Does, B.C., or the individual defendants, we affirm the district court's grant of

summary judgment in favor of B.C. and the individual defendants on the Does' negligence claims.

## F. Negligent Infliction of Emotional Distress

The Does also contend that the district court erred when it dismissed their claims for negligent infliction of emotional distress. However, for the same reasons discussed above, this claim is a nonstarter. The SJC has summarized that the elements of negligent infliction of emotional distress include: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." Payton v. Abbott Labs, 437 N.E.2d 171, 181 (Mass. 1982). Because we are unable to find an independent duty outside of the contractual relationship between the Does and B.C., the Does' claim fails on the first prong. Again, the remedy the Does seek is within the confines of a breach of contract theory and not in tort. We, therefore, affirm the district court's grant of summary judgment in favor of B.C. and the individual defendants on the Does' negligent infliction of emotional distress claims.

## IV. Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of B.C. as to the Does'

(1) breach of contract claim for the 2014 review; (2) Title IX claims, (3) negligence, and (4) negligent infliction of emotional distress claims, and vacate the district court's grant of summary judgment as to the Does' (1) breach of contract claim for the 2012 disciplinary proceedings and (2) basic fairness claim. The case is remanded for further proceedings consistent with this opinion.

**Affirmed in Part; Vacated in Part; and Remanded. Each party shall bear its own costs.**