NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12787


MORGAN HELFMAN  vs.  NORTHEASTERN UNIVERSITY & others.[1]



Suffolk.     December 9, 2019. - July 27, 2020.

Present:  Lenk, Gaziano, Lowy, Budd, Cypher, & Kafker, JJ.


Negligence, College, Duty to prevent harm, Intoxicated person,
     Foreseeability of harm, Vicarious liability, Emotional
     distress.  Intoxication.  Emotional Distress.  Contract,
     Private college, Performance and breach, School handbook.
     Equal Rights Act.  Anti-Discrimination Law, Sex, Unfair
     educational practice.  Education, Private colleges and
     universities, Disciplinary matter.




     Civil action commenced in the Superior Court Department on
October 31, 2016.

     The case was heard by Robert B. Gordon, J., on a motion for
summary judgment.

     The Supreme Judicial Court granted an application for
direct appellate review.


     Mark F. Itzkowitz (Kenneth I. Kolpan also present) for the
plaintiff.
     Daryl J. Lapp (Katherine A. Guarino Baker also present) for
the defendants.

_____

     [1] Katherine Antonucci, Robert Jose, Briana R. Sevigny, Mary
Wegmann, and Madeleine Estabrook.

Lisa A. Parlagreco & Jeffrey S. Beeler, for Heinlein Beeler Mingace & Heineman, P.C., amicus curiae, submitted a brief.
Rebecca J. Roe, of Washington, & Erin K. Olson, for National Center for Victims of Crime & another, amici curiae, submitted a brief.

LENK, J.  This case arises out of an allegedly nonconsensual sexual encounter between two first-year students at Northeastern University(Northeastern)[2] in October 2013.  The plaintiff claims that Northeastern[3] is liable for failing to prevent the sexual assault, as well as for its allegedly inadequate response, including exonerating her alleged attacker after a disciplinary hearing.[4]  Following discovery, a Superior Court judge granted the defendants' motion for summary judgment on all claims.  The plaintiff appealed, and we subsequently allowed her application for direct appellate review.

---

[2] Northeastern is a private, nonprofit educational institution offering undergraduate and graduate degrees.

[3] The five named defendants were Northeastern executives during the relevant period.  Jose was the associate dean of cultural, residential, and spiritual life, and the director of residential life.  He supervised Antonucci, who was an area coordinator, and who trained and oversaw the work of the student resident advisors (RAs).  Estabrook was the associate vice-president for student affairs and oversaw the office of student conduct and conflict resolution (OSCCR).  Wegmann was the director of OSCCR and was responsible for enforcing the code of student conduct and hiring and training members of the student conduct board (SCB) and the appeals board.  Sevigny was the assistant director of OSCCR, and trained residential life staff members, as well as members of the student conduct board.

[4] Northeastern police also determined not to pursue any criminal charges against that student.

In light of the multifaceted relationship between a university and its students, we long have recognized that universities have a duty to protect students from the foreseeable criminal acts of third parties. Such a duty exists even when those criminal acts are made possible by the intoxication of the student victim. Nonetheless, we conclude that there was no duty to protect here, where the Northeastern defendants had at best minimal knowledge of the conditions that gave rise to the particular harm, rendering this assault unforeseeable. Further, although we now also recognize that a college or university will sometimes owe a duty to protect its students from the harms associated with alcohol-related emergencies, we conclude that this duty was met here. Accordingly, we affirm the order granting summary judgment to the defendants on the plaintiff's negligence-related claims. Because there was no error in the motion judge's conclusions regarding the plaintiff's statutory or contract claims, we affirm the allowance of summary judgment on those claims as well.

1. Background. We recite the facts from the summary judgment record in the light most favorable to the nonmoving party, reserving certain details for later discussion.

In the fall of 2013, the plaintiff was a first-year student at Northeastern. As required of all first-year students, she

lived in a university residence hall.  A.G.,[5] the alleged assailant, also was a first-year Northeastern student who lived in the same dormitory.

Northeastern residence halls were supervised by resident assistants (RAs), who were students hired[6] to foster community within the dormitories and provide assistance to resident students.  The RAs in turn were supervised by the residence hall director, a permanent staff person assigned to the same building, and more generally by the area coordinator.  RAs were required to sign a "Resident Assistant Agreement," which set forth the terms of their position as well as some of their duties.

RAs were expected to serve as role models for the younger students, to be familiar with the provisions of Northeastern's code of student conduct (code), and to intervene if they encountered students violating "community norms."  RAs were to hold office hours to meet with students in their assigned residence halls, and to coordinate programs and events in accordance with Northeastern's educational goals.  The goals for first-year students included "understand[ing] the effects of

---

[5] As do the parties, we refer to the student by the pseudonym "A.G."

[6] In exchange for their services, RAs received a dormitory room at no charge, meals in the residence halls, and a small amount of money monthly on a meal card.

drugs and alcohol," "identif[ying] moments of peer pressure," and "attend[ing] at least two on or off campus events that are alcohol free."  RAs performed rounds of their assigned buildings during assigned shifts and were expected to report any code violations to their supervisors.  In addition, RAs served as proctors at the entrances to some residence halls, where they regulated access to the hall.[7]

On October 31, 2013, the plaintiff and A.G. were invited to a Halloween party hosted by Sarah Smith,[8] a sophomore at Northeastern and an RA in a different dormitory[9] from the one in which the plaintiff and A.G. lived.  Before leaving to attend the party, the plaintiff and A.G. drank alcohol in the plaintiff's dormitory room.  They brought more alcohol with them to the party, carried in a plastic soda bottle to conceal its existence from any campus police they might encounter during the walk across campus.

---

[7] As apparently was common, the RAs in this case were both sophomore students at Northeastern, and themselves under the legal age for consumption of alcohol.

[8] Because neither RA is a named defendant, and both were underage students at the time of the alleged assault, we refer to them by pseudonyms.

[9] RA Smith held office hours in a different dormitory from the one in which she lived.  As part of her assigned rounds, however, she also patrolled her own dormitory.

While at the party, the plaintiff played drinking games with some of the partygoers, consuming alcohol provided by certain of them. A.G. also gave her whiskey that he had obtained from another guest. Between her rounds at multiple dormitories, Smith drank alcohol and participated in the drinking games. Another RA, Paul Jones,[10] who had socialized previously with the plaintiff, A.G., and Smith, also attended the party. Both RAs (who themselves were underage) observed other underage students drinking alcohol, but neither RA provided any of the alcohol that the plaintiff consumed, nor did they provide any alcohol to any other guest.

Not long after arriving at the party, the plaintiff became intoxicated and vomited repeatedly in Smith's bathroom; two student acquaintances who were attending the party stayed with her in the bathroom and gave her water and crackers to try to control the nausea. The students also had the plaintiff wait in Smith's room and drink water, as they were somewhat concerned that the proctor at the plaintiff's residence hall might stop the plaintiff at the entrance because she was too visibly intoxicated. They offered to walk the plaintiff home, but she declined because she knew that they were planning to attend another party, and she did not want them to walk across campus

---

[10] A pseudonym. See note 8, supra.

to her residence and then have to walk back to the location of the second party.

As he was returning anyway in order to attend a sports practice early the following morning, A.G. then volunteered to escort the plaintiff to the dormitory where they both lived. On the way back to her residence hall, the plaintiff sent a text message to her roommate stating, "Okay I'm coming home I'm really sick." During the walk, A.G. and the plaintiff kissed multiple times. At one point, the plaintiff stumbled and fell; A.G., who himself was intoxicated, was dragged down to the ground. A.G. also took the plaintiff's telephone and identification card from her while en route. When they reached their residence hall, the plaintiff leaned on the counter for support as the proctor checked their identification. She then walked unsteadily from the proctor's desk to the elevator.

The two students went to A.G.'s room, where A.G. initiated sex with the plaintiff. The plaintiff later told Northeastern police that, "although she was very uncomfortable with what was going on, she didn't want to hurt his feelings by saying anything to him or telling him to stop." She "wasn't scared," but had not felt as if she could leave if she wanted to. She also said that she did not know whether A.G. believed she had consented to the things he was doing. At one point when A.G. went to the bathroom, the plaintiff sent text messages to her

roommate, saying, "I'm ok," and, "Kind of."  At another point, the plaintiff threw up in A.G.'s bathroom.

When the plaintiff returned to her own room the following morning, she told her roommate about the incident with A.G.  In response to one of the roommate's questions, the plaintiff said that, if she had been sober, she would have said something to stop the encounter.  The roommate, with the plaintiff's permission, then informed an RA of the incident.  The following day, the plaintiff and her mother were escorted by Northeastern police from her dormitory to a local hospital, where the plaintiff was examined and an evidence collection kit was completed.

Northeastern police undertook an investigation; they interviewed the plaintiff, her roommate, and A.G.; reviewed the video recordings from the entrance to the plaintiff's residence hall; compiled a list of partygoers, which included the RAs Smith and Jones; and received screenshots of the various text messages sent by the plaintiff.  The police created a report of their investigation and provided it to the office of student conduct and conflict resolution (OSCCR) director Mary Wegmann; Wegmann then shared it with Briana R. Sevigny, the assistant director of OSCCR, and Madeleine Estabrook, the vice-president of student affairs.  Following their investigation, Northeastern

police decided not to file any criminal charges against A.G. and did not report the incident to Boston police.

Based on the Northeastern police report, OSCCR charged A.G. with a code violation of "sexual assault with penetration."[11] At a student conduct board (SCB) hearing on November 21, 2013, both the plaintiff and A.G. were appointed advisors to assist them. Each student asked questions of the other through the SCB chair.

On the day after the hearing, the plaintiff and A.G. both were sent letters explaining that the disciplinary panel had found that A.G. had not committed the alleged offense.[12] Consistent with the procedures in the code at that time, only the letter to A.G. explained the SCB's reasoning.[13] The SCB noted that it had spent a great deal of time reviewing the record, including the surveillance video recordings, due to the serious nature of the charges. The letter explained that the SCB had considered A.G.'s statements about those words and actions

---

[11] The code defined this offense as "the oral, anal, or vaginal penetration by an inanimate object, penis, or other bodily part without consent." Consent was defined as a "voluntary agreement to engage in sexual activity proposed by another and requires mutually understandable and communicated words and/or actions demonstrating agreement by both parties to participate in all sexual activities."

[12] Consistent with Northeastern's policy, the SCB employed a standard of a preponderance of the evidence, i.e., "more likely than not."

[13] Prior to the hearing, the plaintiff explicitly consented to this procedure.

he had seen as the plaintiff's consent, the plaintiff's statements about what she had said and done, and what a reasonable person would have understood about the plaintiff's consent or lack thereof.

The plaintiff submitted an appeal on the ground of asserted issues of fact, without setting forth any requisite procedural error. Unable to determine the nature of the asserted error, the appeals board remanded the matter for a new hearing. In preparing for the de novo hearing, Estabrook concluded that there had been a procedural error in the allowance of the appeal: the plaintiff had not stated the asserted procedural error, and had not sent a copy of her request for an appeal to A.G., nor had she provided him with notice so that he would be able to respond.

Estabrook overturned the appeals board's order, but allowed the plaintiff time to amend her appeal to indicate the specific error she was challenging and to allow A.G. to receive notice of the appeal and an opportunity to respond. The plaintiff submitted an amended appeal, on the grounds of procedural error and newly discovered evidence -- the evidence collection kit.

On February 7, 2014, the appeal on the ground of procedural error was denied, while the appeal on the ground of new evidence was allowed. The matter was remanded to the original SCB so that it could consider the evidence collection kit. The SCB

reconvened and affirmed its original holding that A.G. had not committed a sexual assault. The SCB stated that the evidence collection kit might have confirmed the fact of intercourse, but that fact had not been in dispute; the disputed issue had been as to the question of consent.

2. Discussion. a. Standard of review. We review a decision allowing a motion for summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party, in this case the plaintiff. See LeBlanc v. Logan Hilton Joint Venture, 463 Mass. 316, 318 (2012). "Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Godfrey v. Globe Newspaper Co., 457 Mass. 113, 118-119 (2010). If a plaintiff has failed to establish "an essential element" of her case, all other facts are rendered immaterial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

The plaintiff claims that Northeastern[14] not only negligently failed to prevent the sexual assault, but indeed contributed to its occurrence. She also asserts a number of additional tort, contract, and statutory claims on the ground that Northeastern failed to respond adequately to the incident.

---

[14] The five named defendants were Northeastern executives during the relevant period. See note 3, supra.

b.  Negligence claims.  The plaintiff claims that Northeastern was negligent in several respects:  it failed to protect her from A.G.'s sexual assault, is responsible for the unreasonable acts and omissions of its RAs, and failed to exercise due care in training and supervising both its permanent staff and its "paraprofessional" RA and SCB staff.[15]

To sustain a claim of negligence, a plaintiff must establish that (1) the defendant owed a legal duty to the plaintiff, (2) the defendant committed a breach of that duty, (3) there was a causal connection between the defendant's negligence and the plaintiff's injury or damage, and (4) the plaintiff sustained damages.  See Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 221-222 (2009).  "[T]he existence of a duty is a question of law, and is thus an appropriate subject of summary judgment."  Jupin v. Kask, 447 Mass. 141, 146 (2006).

i.  Whether Northeastern owed a duty.  "Under our case law, [one does] not owe others a duty to take action to rescue or protect them from conditions [one has] not created" (quotation and citation omitted).  Dzung Duy Nguyen v. Massachusetts Inst. of Tech., 479 Mass. 436, 448 (2018).  See Restatement (Third) of Torts:  Phys. & Emot. Harm § 37 (2012) ("An actor whose conduct

---

[15] Student members of the SCB were volunteers who attended particularized training, but received no compensation of any kind for their ad hoc work as board members.

has not created a risk of physical or emotional harm to another has no duty of care to the other . . ."). Generally, this no-duty rule extends to the criminal acts of third parties. See Jupin, 447 Mass. at 148. It is, however, subject to certain exceptions, two of which the plaintiff asserts are applicable here. She argues that Northeastern owed her a duty to protect her by virtue of the special relationship between a university and its students. Additionally, she maintains that RAs Smith and Jones exposed her to the foreseeable criminal acts of a third party, and that Northeastern had a duty to protect her from the resulting harm.

We agree that, here, a special student-university relationship between the plaintiff and Northeastern did exist. See Dzung Duy Nguyen, 479 Mass. at 450 (describing special relationship). We nonetheless conclude that Northeastern had no duty to take steps to prevent the alleged sexual assault, because it was not reasonably foreseeable that the plaintiff would suffer a criminal act by a third party or other imminent physical harm due to her intoxication at the time of the incident.

A. Special relationship between university and student. In Mullins v. Pine Manor College, 389 Mass. 47, 54 (1983), we first recognized that colleges and universities have a special relationship with their students which imposes a "duty . . . to

14

protect their resident students against the criminal acts of third parties." Although this duty was related to the university's control over its campus, the relationship we recognized was not limited to a university's role as a landlord or property owner. Rather, it arose out of the "distinctive relationship between colleges and their students." Id. at 56. It was grounded both on the "reasonable expectation, fostered in part by colleges themselves, that reasonable care will be exercised to protect resident students from foreseeable harm," id. at 52, and the observation that universities "generally undertake voluntarily to provide their students with protection from the criminal acts of third parties," id. at 53.

The defendants nonetheless maintain that whatever special relationship exists between a university and its student does not impose a duty to protect a student while he or she is voluntarily intoxicated. They argue, therefore, that the Mullins duty does not apply, and that Northeastern had no other duty to protect the plaintiff from any potentially harmful consequences of her choice to drink alcohol. In both respects, we disagree.

I. Voluntarily intoxicated students. As many courts have noted, requiring colleges and universities to police all on-

campus use of alcohol would be inappropriate and unrealistic.[16] Although "[t]here was a time when college administrators and faculties assumed a role in loco parentis" and "[s]tudents were committed to their charge because the students were considered minors," "[c]ollege administrators no longer control the broad arena of general morals." Bradshaw v. Rawlings, 612 F.2d 135, 139-140 (3d Cir. 1979), cert. denied sub nom. Borough of Doylestown v. Bradshaw, 446 U.S. 909 (1980). College-aged students, while sometimes underage for the purposes of the purchase and consumption of alcohol, otherwise are adults expected to manage their own social activities. See Furek v. University of Del., 594 A.2d 506, 516-517 (Del. 1991) ("students are now regarded as adults in almost every phase of community life" [quotation and citation omitted]). Illicit consumption of alcohol is an activity that falls well outside the educational mission of the modern university, and the additional intrusion

---

[16] See Doe v. Emerson College, 153 F. Supp. 3d 506, 514 (D. Mass. 2015) (imposing duty to prevent on-campus alcohol abuse "would be impractical and unrealistic"). See, e.g., Guest v. Hansen, 603 F.3d 15, 21-22 (2d Cir. 2010) (no duty to prevent harms from drinking, even when university was aware of conduct); Booker v. Lehigh Univ., 800 F. Supp. 234, 240-241 (E.D. Pa. 1992), aff'd, 995 F.2d 215 (3d Cir. 1993) (no duty to student who was injured after becoming inebriated at on-campus fraternity party). See also Restatement (Third) of Torts: Phys. & Emot. Harm § 40 & comment l (2012) (courts reject duty to protect students from excessive alcohol use); Bendlin, Cocktails on Campus: Are Libations A Liability?, 48 Suffolk U. L. Rev. 67, 73 (2015) (noting duty has been rejected in "majority" of cases).

into the private lives of students that would be necessary to control alcohol use on campus would be both impractical for universities and intolerable to students.[17]

It does not follow, however, that a student relinquishes any reasonable expectation of protection from his or her college or university if the student becomes intoxicated. Unlike some courts, we have not endorsed the view that the end of the era of in loco parentis justified an effective "judicial grant of collegiate immunity for the repercussions of student alcohol consumption."[18] See Dall, Determining Duty in Collegiate Tort Litigation: Shifting Paradigms of the College-Student Relationship, 29 J.C. & U.L. 485, 496 (2003). In Mullins, we rejected that position, and observed that "the fact that a

---

[17] Moreover, part of the collegiate experience is the freedom to make choices, even bad ones, as a student transitions into adulthood. Imposing a duty on colleges and universities to police alcohol use on campus "would inevitably lead to repressive regulations and a loss of student freedoms, thus contravening a goal of higher education: 'the maturation of the students.'" See Smith v. Day, 148 Vt. 595, 599 (1987), quoting Baldwin v. Zoradi, 123 Cal. App. 3d 275, 291 (1981).

[18] See Beach v. University of Utah, 726 P.2d 413, 419 (Utah 1986) ("It would be unrealistic to impose upon an institution of higher education the additional role of custodian over its adult students and to charge it with responsibility for preventing students from illegally consuming alcohol and, should they do so, with responsibility for assuring their safety and the safety of others"). See, e.g., Bradshaw v. Rawlings, 612 F.2d 135, 140-141, 143 (3d Cir. 1979). These decisions reflected an understanding that, as students were adults capable of choosing for themselves, universities owed them no more duty than they would any other bystanders.

college need not police the morals of its resident students . . . does not entitle it to abandon any effort to ensure their physical safety." Mullins, 389 Mass. at 52. More recently, in the private carrier context, we rejected the outdated view that the voluntary consumption of alcohol by a plaintiff "is the sole consideration in the assessment of a duty." Commerce Ins. Co. v. Ultimate Livery Serv., Inc., 452 Mass. 639, 650 (2008) ("A private carrier . . . which transports intoxicated persons can reasonably foresee that passengers . . . may not be fully capable of making rational decisions about their ability to drive") We are not persuaded by the defendants' argument that no duty exists, and that the duties arising from the university-student relationship ought not to be treated similarly in the context here.[19]

Moreover, like the era of in loco parentis, the "bystander" era from which those "no duty" decisions emerged also appears to be drawing to a close. As we stated in Dzung Duy Nguyen, "[u]niversities are clearly not bystanders or strangers in regards to their students." Dzung Duy Nguyen, 479 Mass. at 450.

---

[19] See Furek v. University of Del., 594 A.2d 506, 522 (Del. 1991) ("[a university] has a duty to regulate and supervise foreseeable dangerous activities occurring on its property," including hazing); Coghlan v. Beta Theta Pi Fraternity, 133 Idaho 388, 400 (1999) (recognizing existence of duty where "university employees knew or should have known that [student] was intoxicated and should have acted at the time they saw her prior to her injury").

Rather, "university involvement extends widely into other aspects of student life." Id. In addition to education, many universities provide access to basic necessities such as housing and food, along with the "social, athletic, and cultural opportunities" that form the foundation of a collegiate "community." See id. at 451, quoting Regents of the Univ. of Cal. v. Superior Court of Los Angeles, 4 Cal. 5th 607, 625 (2018); R.D. Bickel & P.F. Lake, The Rights and Responsibilities of the Modern University 85 (1999) ("Universities . . . plan, regulate and administer most aspects of student life").

While universities and colleges nonetheless are "not responsible for monitoring and controlling all aspects of their students' lives," the contemporary paradigm of the university-student relationship recognizes that students' "right to privacy and their desire for independence may conflict with their immaturity and need for protection." See Dzung Duy Nguyen, 479 Mass. at 451-452. Accordingly, we reject the defendants' blanket contention that, necessarily, universities have no special relationship with voluntarily intoxicated students.

II. Contours of special relationship between university and its intoxicated students. Given that voluntary intoxication, in and of itself, does not preclude the existence of a special relationship between a student and a college or university, we turn to the scope of a university's or college's

duty to its intoxicated students.  In doing so, we "take into account a complex mix of competing considerations," Dzung Duy Nguyen, 479 Mass. at 452, including students' interests in both safety and autonomy, as well as the burden of such a duty on the educational institutions.  To help guide this analysis, we look to "a number of factors used to delineate duties in tort law."  Id.  "Foremost among these is whether a defendant reasonably could foresee that he [or she] would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so."[20]  Irwin v. Ware, 392 Mass. 745, 756 (1984).

As noted, dangerous drinking-related activities are a foreseeable hazard on college and university campuses.[21]  Because

---

[20] Other factors that may be relevant include the "degree of certainty of harm to the plaintiff; burden upon the defendant to take reasonable steps to prevent the injury; some kind of mutual dependence of plaintiff and defendant upon each other, frequently . . . involving financial benefit to the defendant arising from the relationship; moral blameworthiness of defendant's conduct in failing to act; and social policy considerations involved in placing the economic burden of the loss on the defendant."  Dzung Duy Nguyen v. Massachusetts Inst. of Tech., 479 Mass. 436, 452 (2018).

[21] See National Institute on Alcohol Abuse and Alcoholism, High-Risk Drinking in College:  What We Know and What We Need To Learn, at v, 10-11 (Apr. 2002), https://www.collegedrinking prevention.gov/media/finalpanel1.pdf [https://perma.cc/3CVU-8D4K] (estimating that fifty percent of male students, and twenty-nine to forty percent of female students, engage in "binge drinking," defined as consuming five or more drinks in a row for males, and four or more drinks in a row for females); Wechsler, Lee, Nelson, & Kuo, Underage College Students'

of their youth and lack of experience with the consumption of alcohol outside their family circle, many college students are particularly susceptible to risky drinking behaviors.  Massie, Suicide on Campus:  The Appropriate Legal Responsibility of College Personnel, 91 Marq. L. Rev. 625, 661 (2008) ("the brain's maturation process . . . continues into young adulthood, at least through the early twenties").[22]  "Colleges and universities, where young people in their late teens and early twenties live close together in a 'pressure cooker' environment, arguably might exacerbate a tendency towards impulsive behavior

---

Drinking Behavior, Access to Alcohol, and the Influence of Deterrence Policies, 50 J. Am. College Health 223, 223 (2002) (suggesting that forty percent of all college students engage in binge-drinking).  Each year, according to at least one government report, there is a strong correlation between students' consumption of alcohol and sexual assaults, physical assaults, and student deaths.  See National Institute on Alcohol Abuse and Alcoholism, Fall Semester -- A Time for Parents To Discuss the Risks of College Drinking, https:// www.niaaa.nih.gov/sites/default/files/publications/NIAAA_ BacktoCollege_Fact_sheet.pdf [https://perma.cc/5YFY-ZE9A].

[22] One researcher has postulated that the "late development of the frontal lobe, responsible for the 'executive functions,' may help to account for teenagers' willingness to indulge in risky behaviors, including experimentation with alcohol and drugs."  Massie, Suicide on Campus:  The Appropriate Legal Responsibility of College Personnel, 91 Marq. L. Rev. 625, 662 (2008).  While not all college-age students are in their teens, at the time of the incident at issue here, both the plaintiff and A.G. were teenagers, as were Paul Jones and Sarah Smith.

that a 'sober second thought' would perhaps quell."[23]  Id.
at 662.

Colleges and universities recognize these foreseeable risks
and have taken reasonable measures to protect students in the
event of an alcohol-related emergency.  See Mullins, 389 Mass.
at 55 (recognizing duty where risk of harm to student "was not
only foreseeable but was actually foreseen").  Northeastern, for
example, directs students to contact Northeastern police
officers[24] for assistance when faced with crises that occur on
university grounds, including those caused by alcohol.  See
Northeastern University police department, Emergency Medical
Services, https://nupd.northeastern.edu/our-services/emergency-
medical-services [https://perma.cc/DC8J-996X].[25]  Northeastern

---

[23] According to the National Center for Education
Statistics, in 2019, there were 19.9 million college students in
the United States.  National Center for Education Statistics,
Fast Facts, https://nces.ed.gov/fastfacts/display.asp?id=372
[https://perma.cc/VFZ5-NXSM].

[24] These police officers are Northeastern employees,
appointed under statutory authority, who have jurisdiction over
Northeastern's buildings and grounds.  See G. L. c. 22C, § 63.

[25] A survey of local universities demonstrates the
widespread adoption of university policies directing students to
contact university police when there is a medical emergency on
campus.  Some universities also have required students to
contact university police when they believe a student is
imperiled due to alcohol intoxication.  See Massachusetts
Institute of Technology, Mind and Hand Book 2019-2020
§ II(2)(C):  Requirement to Obtain Medical Assistance for
Emergencies Involving Alcohol and Prohibited Substances,
https://handbook.mit.edu/aodemergency [https://perma.cc/QVK7-

also offers "medical amnesty" for students who contact it in a medical emergency involving underage consumption of alcohol, and offers amnesty from punishment for students and organizations who reach out for help in such an emergency.

Given these efforts, it is foreseeable that a student will reasonably rely on his or her college or university for aid in the event of an alcohol-related emergency. See Dzung Duy Nguyen, 479 Mass. at 455 ("Reliance of the student on the university for assistance, at least for students living in dormitories or away from their parents or guardians, is . . . foreseeable"); Irwin, 392 Mass. at 756 ("reasonable reliance by the plaintiff [on the defendant university], impeding other persons who might seek to render aid" from offering help, is factor in duty analysis). Reliance is particularly foreseeable for first-year students like the plaintiff, whom Northeastern required to live on campus in its dormitories. When such a student confronts an on-campus alcohol-related emergency, "[u]niversities are in the best, if not the only, position to assist." See Dzung Duy Nguyen, supra.

After weighing these considerations, we conclude that a university has a special relationship with its students, and a

HQW9]; Fletcher School of Law and Diplomacy, Tufts University, Student Handbook 2018-2019, at 29, https://sites.tufts.edu /fletcherconnect/files/2018/07/Student-Handbook-2018-2019.pdf [https://perma.cc/FG75-NL3F].

corresponding duty to take reasonable measures to protect students from harms associated with alcohol-related emergencies, in the following, narrow circumstances.  When a college or university has actual knowledge of conditions that would lead a reasonable person to conclude that a student on campus is in imminent danger of serious physical harm due to alcohol intoxication, and so intoxicated that the student is incapable of seeking help for him- or herself, the college or university has a duty to take reasonable measures to protect that student from harm.  See Dzung Duy Nguyen, 479 Mass. at 453 (recognizing limited duty to take reasonable measures to protect students from suicide).[26]

This duty is limited in several important respects.  It applies only when a university is already aware that a student is at imminent risk of harm.  Analyzing the degree of harm does not require the knowledge or precision of a medical doctor; it merely requires the recognition that a young person is dangerously intoxicated.[27]  Equipped with such knowledge, a

---

[26] This conclusion also does not absolve a student of personal responsibility for his or her drinking.  A jury of course may consider intoxication when weighing whether the "duty was violated, and in determining causation."  Commerce Ins. Co. v. Ultimate Livery Serv., Inc., 452 Mass. 639, 650 (2008).

[27] In addition to considering the degree of intoxication, a university or college also should consider the context of the drinking, and a continuum of harms, such as whether a student is unconscious outside, continuing to consume at a party, or inside

college or university merely must act reasonably under the circumstances. In some cases, to strike the appropriate balance between respecting a student's autonomy and the need to protect his or her physical well-being, a reasonable response will include doing little or nothing at all, while in others, calling for medical or other forms of assistance might be warranted.

B. The foreseeability of the harm. Notwithstanding the special university-student relationship that existed between Northeastern and the plaintiff, we conclude that Northeastern owed no duty to protect her in this instance. A university's duty to protect its students extends only to those harms which, based on "an examination of all the circumstances", Mullins, 389 Mass. at 56, were reasonably foreseeable at the time. See, e.g., Dzung Duy Nguyen, 479 Mass. at 455 (duty "hinges on foreseeability"). On this record, we conclude that Northeastern could not reasonably have foreseen that, absent some intervention on its part, the plaintiff would be subjected to a criminal act or other harm.

I. Foreseeability of criminal act by third party. At the time of the alleged assault, Northeastern had no indication that

---

an assigned dormitory room. Similarly, students with a history of drinking to the point of alcohol poisoning may pose an enhanced risk to themselves of future physical harm.

A.G. posed any risk to the plaintiff.[28]  While "[p]rior criminal acts are simply one factor" in the foreseeability analysis, see Mullins, 389 Mass. at 56, we note that nothing in the record indicates that A.G. had a history of sexual assaults, of which Northeastern was aware (or otherwise).  Cf. Schaefer v. Yongjie Fu, 272 F. Supp. 3d 285, 288 (D. Mass. 2017) (duty arose where university had knowledge that made specific criminal acts foreseeable).  Northeastern police conducted a search of their records and found no other reported incidents involving A.G. as an assailant.  Nor did the plaintiff identify any concerns that she or anyone else possessed regarding A.G. before this incident.  To the contrary, she indicated that she had had none.

Furthermore, the plaintiff does not argue, nor is there any evidence to suggest, that residence life officers, area directors, or other full-time staff were aware of the events leading up to the alleged assault.  At most, therefore, Northeastern's awareness of the circumstances surrounding this incident was limited to the observations of Jones, an off-duty RA, Smith, an on-duty RA, and an unknown proctor at the plaintiff's dormitory.

---

[28] There is no indication in the record that Northeastern's lack of information about the circumstances was the product of negligence or willful blindness on the part of Northeastern.

While the issue is a close one on whether the RAs or proctor were agents in these circumstances, we need not reach that issue.[29]  Even if we were to assume that all of their knowledge could be imputed to Northeastern, they lacked sufficient information that would have led a reasonable person to conclude that the plaintiff was at risk of being assaulted.

There is no indication in the record that A.G. or any other attendee acted inappropriately towards the plaintiff at the party.  Before, during, and after the party, she was capable of communicating with other students, both in person and via text message, and was managing her intoxication.  Toward the end of the party, Smith was told that two female students would escort the plaintiff back to her dormitory.  Based on these observations, it would not have been foreseeable that A.G. would assault the plaintiff later that evening.

Arguably, the proctor who was working at the plaintiff's residence hall when she returned with A.G. perhaps had the best

---

[29] RAs, as students who receive some form of in-kind compensation (room and partial board) for their work for Northeastern, occupy a hybrid role that may not cleanly fit within the definition of "employee" for the purposes of tort law.  See Helms, Pierson, & Streeter, The Risks of Litigation: A Case Study of Resident Assistants, 180 Ed. Law Rep. 25, 26 (2003) ("As both students and employees, RAs' employment status is inextricably intertwined with their academic status").  It is also apparent from the student code of conduct that, at least while on duty, RAs were empowered and expected to enforce university policies on behalf of Northeastern.

opportunity to observe the situation and intervene if necessary.[30] There is no direct evidence in the record, however, of what that proctor observed, or, for that matter, the identity of that individual. At most, other evidence[31] supports the inference that the proctor saw an intoxicated male and female return to the residence hall where they both resided and check in at the front desk. The proctor likely observed the plaintiff lean on the desk for support while signing in, before unsteadily making her way to the elevator. There is no indication that A.G. was acting aggressively or sexually towards the plaintiff, or that the plaintiff appeared to be dangerously intoxicated at that point. The mere presence of an intoxicated young woman in the company of an intoxicated young man as they returned to

---

[30] The plaintiff asserts that the proctor failed in his or her duty by not calling the Northeastern police and having them assess whether she safely could have been allowed into the residence hall given her visibly intoxicated state. There is evidence in the record that other students at the party considered that the proctor might take actions in response to intoxication. The plaintiff testified as well, however, that if she had been approached by Northeastern police, she would have said that she was "fine," and "with a friend," and would have declined any help.

[31] A police report indicates that the plaintiff and A.G. were captured on video surveillance footage returning to the residence hall and checking in with the proctor. This recording was not included in the record on summary judgment, but was examined by Northeastern police, who testified as to its contents.

their shared residence hall does not, without more, suggest that a crime or physical harm is imminent.

The plaintiff maintains that Northeastern should have foreseen that she would be sexually assaulted because of the generally recognized connection between alcohol and sexual assault on college campuses. As we have noted, studies do reflect that sexual assaults on college campuses are "a major public health problem," and that "[o]ver half of all college sexual assaults involve alcohol and alcohol is the number one drug used to facilitate sexual assault." The plaintiff argues, based on a report by a Department of Health and Human Services task force, that approximately 70,000 college students "are victims of alcohol-related sexual assault annually" in the United States.

This recognized relationship between alcohol and sexual assault on campus, however, standing alone, is not sufficient to impose a duty on Northeastern. See Lake, Private Law Continues to Come to Campus: Rights and Responsibilities Revisited, 31 J.C. & U.L. 621, 649 (2005) ("notifying [an RA] that someone is drunk does not alert the [RA] that a rape is likely"); Hernandez v. Baylor Univ., 274 F. Supp. 3d 602, 619 (W.D. Tex. 2017) ("Courts across the country have determined . . . that the general foreseeability of sexual assault on campus is insufficient to warrant negligence liability"). This is

precisely the overreaching type of duty that we have never imposed on universities, and which we again expressly reject today.

     II.  <u>Foreseeability of imminent alcohol-related harm</u>. Similarly, based on the RAs' and the proctor's observations of the plaintiff, it would not have been apparent to a reasonable person that she was at imminent risk of physical harm due to alcohol intoxication.  While the plaintiff was obviously intoxicated at least part of the time that she was in Smith's room, it did not appear that she was experiencing an emergency. The plaintiff did not lose consciousness during the evening or exhibit other indications that she was dangerously intoxicated. She was talking with other students, sending text messages, and later eating crackers and drinking water in response to her nausea.  No one encouraged her to seek medical attention; the students who were in the bathroom with her did not think that help was necessary, and the plaintiff herself believed that she did not need any.  At most, some other students believed that the plaintiff should be escorted home by peers and, accordingly, offered to walk her home.

     Moreover, in the absence of an ongoing emergency, it was reasonable for Jones and Smith to respond to the plaintiff's intoxication as they did.  Jones, an off-duty RA, informed Smith, an on-duty RA, that a fellow student appeared ill due to

drinking alcohol. Rather than continue with her rounds, Smith stopped to check on the plaintiff. She spoke with the two female students who were taking care of the plaintiff at the time and saw that these students were feeding and hydrating her. After listening for any indication that the plaintiff was still vomiting, and hearing none, Smith then permitted or acquiesced in the plan that those two students escort the plaintiff back to her own dormitory.

At that point, it was not negligent for the RAs to allow those two students to walk the plaintiff home. Indeed, Northeastern's policy stated that an RA need not seek further help or arrange transportation if the RA believed that an intoxicated student was being assisted by another person. The fact that, unbeknownst to Smith and Jones, the plaintiff later turned down this offer of help and opted instead to walk back to her dormitory with A.G. does not make their decisions unreasonable.[32]

Considering all of the information that Northeastern had at its disposal, it was not reasonably foreseeable that the plaintiff was in peril at the time of the alleged assault.

---

[32] Nor, for that matter, would it have been negligent for the RAs to allow A.G. to escort the plaintiff home in the first instance. A.G. was a friend of the plaintiff, they came to the party together, and they would be returning to their shared residence hall.

Because Northeastern was not on notice that it would be required to step in and protect the plaintiff, the existence of a special relationship alone did not impose an obligation on Northeastern to act. We therefore conclude that, on the particular facts here, Northeastern did not owe a legal duty to the plaintiff on the basis of a special relationship. In the absence of such a duty, summary judgment properly was granted on this portion of the plaintiff's negligence claim.

ii. _Vicarious liability_. The plaintiff further asserts that by holding the Halloween party, RAs Smith and Jones created an unreasonable risk that she would be sexually assaulted. See Restatement (Second) of Torts § 302B (1965). Thus, she claims that Northeastern owed a duty to protect her from the resulting harms of that party. See _Elias_ v. _Unisys Corp_., 410 Mass. 479, 481 (1991) ("The [vicarious] liability of the principal arises simply by the operation of law and is only derivative of the wrongful act of the agent")

To be sure, by throwing, or tacitly permitting, this underage drinking party, the RAs hardly covered themselves with glory. The plaintiff's argument nonetheless fails, however, because, as noted _supra_, the subsequent steps that the RAs took to protect the plaintiff were appropriate under these circumstances. Whatever duty the RAs may have owed to protect the plaintiff in these circumstances was clearly met.

As the plaintiff cannot establish any breach of a duty on the part of the RAs, her derivative claims against the university fail as a matter of law.

iii.  Negligent supervision and training.  The plaintiff argues that individual defendants Sevigny, Wegmann, and Estabrook, as well as Northeastern itself, should be liable for the negligent training and supervision of the RAs and the SCB members.

The plaintiff's claim against Northeastern and the individual defendants fails because there is no evidence that any of the defendants was negligent in training or supervising its student resident advisors.  "Employers are responsible for exercising reasonable care to ensure that their employees do not cause foreseeable harm to a foreseeable class of plaintiffs."  Roe No. 1 v. Children's Hosp. Med. Ctr., 469 Mass. 710, 714-715 (2014).  To establish an employer's liability for negligently training and retaining an employee, a plaintiff must show that the "employer [became] aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment."  Foster v. The Loft, Inc., 26 Mass. App. Ct. 289, 291 (1988).

Northeastern's RAs went through a two and one-half week initial training program, followed by additional workshops.

They also met with university staff on a weekly basis.  As part of the training, one student explained, RAs were directed to report underage drinking and respond according to the severity of the student's intoxication.[33]  This training included recognizing warning signs of the excessive consumption of alcohol.

Arguably, by failing to report the underage drinking that they observed, and by engaging in underage drinking themselves, the RAs apparently did not follow their training on the night in question.  Nonetheless, and notwithstanding Northeastern staff's ongoing supervision, it does not appear on this record that Northeastern or any of the individual defendants were aware of any issues with these two RAs prior to the Halloween incident. Because the defendants did not know, or have reason to know, that the RAs would not conduct themselves according to Northeastern's policies and training, the defendants were not negligent.

Similarly, the SCB members (who were uncompensated) underwent both a general training on disciplinary proceedings, and an additional training specific to sexual assault cases.  In addition, the SCB members were required to observe a full SCB

---

[33] Northeastern's written policy, however, set out in the student handbook, allowed a "medical amnesty" for intoxicated students in which, among other actions short of reporting, RAs could arrange for an escort home.

proceeding before participating in one. There is no evidence that the SCB members failed to follow the provisions of Northeastern's code of conduct, or any policies from their training, when considering the events at issue here. Nor is there any indication that Northeastern staff became aware of, or should have become aware of, any problems with the SCB members' knowledge of the Northeastern code. See Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 614 (D. Mass. 2016) (Brandeis Univ.). To the contrary, the SCB letter explained clearly the factors the SCB considered in evaluating the issue of consent and its understanding of the definition of consent under the code. Accordingly, the defendant cannot sustain her claim of negligent supervision and training.

c. Negligent infliction of emotional distress. There also was no error in the judge's decision to deny the plaintiff's claim for negligent infliction of emotional distress. "[I]n order to recover for negligently inflicted emotional distress," a plaintiff must prove the following: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." Payton v. Abbott Labs, 386 Mass. 540, 557 (1982).

For all the reasons discussed in part 2.b, supra, the plaintiff cannot sustain her negligence claims.  Accordingly, the motion judge properly concluded that, absent the necessary element of negligence, the defendants' motion for summary judgment had to be allowed on those counts.

d.  Breach of contract.  In addition to her negligence claims, the plaintiff contends that Northeastern committed a breach of a contract with her in which it promised to conduct its disciplinary proceedings in accordance with its stated procedures and the code of conduct in the student handbook.  Although the plaintiff had such a contract with Northeastern, there was no breach.

Claims that a university did not exercise proper care or follow its established procedures in student disciplinary proceedings have been treated as claims for breach of contract, based on the university's student handbook or other documents, such as the student code of conduct at issue here.  See, e.g., Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000); Walker v. President & Fellows of Harvard College, 82 F. Supp. 3d 524, 528-529 (D. Mass. 2014), aff'd, 840 F.3d 57 (1st Cir. 2016).  "Contracts between students and universities are interpreted 'in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them.'"  Walker, supra at 528,

quoting Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007). Interpretation of a contract, including "any ambiguities . . . in the disputed contract terms," is a question of law decided de novo by the reviewing court. See Walker, supra at 529, citing Driscoll v. Trustees of Milton Academy, 70 Mass. App. Ct. 285, 293 (2007).

To decide whether there was a breach of contract as a result of a disciplinary proceeding, we examine the conduct of the disciplinary hearing to determine whether Northeastern failed to meet the student-plaintiff's "reasonable expectations," and whether the hearing was conducted with "basic fairness" (citations omitted). See Brandeis Univ., 177 F. Supp. 3d at 594. The plaintiff identifies two ways in which she asserts that Northeastern committed a breach of its contract while conducting the disciplinary hearing. She points to Estabrook's denial of her appeal after the appeals board had allowed it, and a lack of "basic fairness" at the subsequent second hearing, in part due to the destruction of the recording of the original hearing. See id.

Neither of these asserted missteps represents a breach of Northeastern's contract with the plaintiff. Estabrook, as the vice-president of student affairs, was responsible "for the overall administration of the Code of Student Conduct as well as the Student Conduct Process." On the record before the court,

it is apparent that Estabrook's position afforded her the implied authority to rectify serious errors in the SCB process, including the authority to overturn otherwise final decisions of the appeals board. When she vacated the appeals board's decision allowing a new hearing on the ground of procedural error, Estabrook merely exercised that authority. It would be an absurd result to decide that the plaintiff reasonably could have expected to proceed with an appeal on the ground of procedural error, where she did not point to any procedural error in the initial proceeding.

Likewise, the plaintiff's claim that she was harmed by the destruction of the transcript of the original hearing cannot succeed. Prior to filing her appeal, the plaintiff explicitly declined Northeastern's offer that she listen to an audio recording of the hearing. Following the allowance of her appeal (which did not rely on the recording), the tapes were destroyed, as specifically provided for under the then-existing terms of the code (in an effort to protect students' privacy and confidentiality). The plaintiff thus could not have had a reasonable expectation that the tapes would be retained, nor did she make any request for an exception such that the tapes would not be destroyed when she initially declined to listen to them.

The plaintiff also points to a number of purported flaws in the then-existing written code, including the provision

prescribing destruction of recordings after the conclusion of an appeal, which was intended to protect the privacy of the parties.  These issues with the code itself, however, do not indicate that Northeastern committed a breach of the terms of the code.  Whatever flaws it arguably contained were not so egregious that they could have violated the plaintiff's reasonable expectations, or resulted in fundamental unfairness.  In any event, it is the terms of the code, and not the changes the plaintiff would like to have seen made, that were at issue on appeal.  In the absence of a breach, the plaintiff's contract claim could not survive the motion for summary judgment.

e.  <u>MERA claim</u>.  For similar reasons, summary judgment properly was granted for the defendants on the plaintiff's claim under the Massachusetts Equal Rights Act (MERA).  MERA provides, in relevant part, that "[a]ll persons within the commonwealth, regardless of sex . . . , shall have . . . the same rights enjoyed by white male citizens, to make and enforce contracts . . . and to the full and equal benefit of all laws." G. L. c. 93, § 102 (<u>a</u>).

The parties agree that the plaintiff's MERA claim is based entirely on Northeastern's asserted breach of its contract with her.  Accordingly, because the breach of contract claim cannot succeed, for the reasons discussed <u>supra</u>, the judge properly

determined that the plaintiff also could not prevail on her MERA claim.

f.  Title IX claim.  The plaintiff also raises a Federal claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (Title IX).  Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  See Wills v. Brown Univ., 184 F.3d 20, 35 (1st Cir. 1999) (Lipez, J., dissenting).  The protections of Title IX are "enforceable through an implied private right of action against an educational institution . . . [that] can include a demand for monetary damages."  Id. at 36.

"[T]he provisions of Title IX indicate that a funding recipient should be liable only for its own actions, and not for the independent actions of an employee or a student. . . . [T]he administrative-enforcement scheme for Title IX permitted the imposition of financial penalties only after funding recipients received actual notice of discrimination within their programs and were given an opportunity to institute corrective measures; they would be subject to sanctions only for their failure to respond rather than for an employee's independent acts."  Simpson v. University of Colorado Boulder, 500 F.3d

1170, 1175 (10th Cir. 2007), citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 287-289 (1998).

The plaintiff argues that Northeastern violated Title IX by responding with deliberate indifference to the sex discrimination she suffered.  She asserts that Northeastern failed properly to train the students who oversaw the disciplinary proceedings, resulting in an inadequate process that left her vulnerable to future harassment by A.G.  See Wills, 184 F.3d at 25-26 (discussing Title IX standard).  See also Doe I v. University of Tenn., 186 F. Supp. 3d 788, 812 (M.D. Tenn. 2016) (describing ongoing injury from improper Title IX proceedings).  The plaintiff maintains further that the conduct of the SCB inquiry, and the intervention by Estabrook, cast doubt on the accuracy of the disciplinary process and support an inference that gender bias was a motivating factor. See Doe v. Columbia Univ., 831 F.3d 46, 57 (2d Cir. 2016) (Columbia Univ.).  For the reasons discussed infra, this Federal law claim fares no better than the plaintiff's other claims.

i.  Deliberate indifference.  To sustain a cause of action that is not based on an "official policy" of a university, a plaintiff must show that "an official who at a minimum [had] authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf [had] actual knowledge of discrimination" and responded with "deliberate

indifference." Gebser, 524 U.S. at 290.  See Doe v. Trustees of Boston College, 892 F.3d 67, 93 (1st Cir. 2018) (Trustees of Boston College).  The underlying "discriminatory act must be so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  Id., citing Porto v. Tewksbury, 488 F.3d 67, 72 (1st Cir. 2007).  In turn, a university's response must be "clearly unreasonable in light of the known circumstances."  Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 648 (1999).  See Farmer v. Kansas State Univ., 918 F.3d 1094, 1099 (10th Cir. 2019), quoting Davis, supra at 648-649 ("Title IX does not require a funding recipient to acquiesce in the particular remedial action a victim seeks. . . .  '[T]he recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable'").

When Northeastern first learned of the asserted assault, it "acted expeditiously and reasonably, and exhibited no indifference at all to [the plaintiff's] allegations."  Hayut v. State Univ. of New York, 352 F.3d 733, 752 (2d Cir. 2003).  Upon learning of the allegations, Northeastern initiated an investigation that culminated in the SCB proceedings.  It also issued a no-contact order against A.G.; the order remained in place throughout the plaintiff's time at Northeastern.  The plaintiff was offered, and received, ongoing counselling from

Northeastern.  Northeastern also extended other accommodations to her, including offering to move her and her roommate to a "safe room," or transferring her out of classes she shared with A.G., but ultimately she decided not to accept these additional measures.[34]

On the whole, "the record not only fails to support [the plaintiff's] contention, it proves otherwise."  Doherty vs. Emerson College, U.S. Dist. Ct., No. 1:14-CV-13281-LTS (D. Mass. Sept. 29, 2017) (initiating investigation, issuing stay away order, and offering counselling was reasonable initial response).  As the record reflects, the SCB's hearing procedures were not deficient.  Prior to the first SCB hearing, the plaintiff was appointed an advisor to assist her and to be present at the hearing, as was A.G.  At her request, the plaintiff was allowed to ask questions of A.G. through the SCB chair, who heard the question as stated by the plaintiff, and then posed it to A.G.; A.G. similarly was allowed to ask questions of the plaintiff.  The SCB ultimately decided the case based on a complainant-friendly preponderance of the evidence standard.  Examining the totality of the proceedings, we conclude that they do not reflect deliberate indifference.

---

[34] While these otherwise appropriate accommodations are not unreasonable in these circumstances, we note that it was the plaintiff, rather than A.G., who would have been required to adjust her living and studying arrangements.

Similarly, the plaintiff's assertions that the students who took part in the proceedings were insufficiently trained is not supported by the record. To sustain her claim, the plaintiff would have to demonstrate that Northeastern had a "policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of [the SCB] program." Simpson, 500 F.3d at 1178. Here, the students received specific Title IX training that included explanations of the key concepts in this case, among them incapacitation and consent; the students were instructed that someone who is incapacitated can never give consent. This definition, and the explanation, also were set out plainly in the code that was provided to all students. That the students could not precisely define certain terms at their depositions, five years after the incident, does not raise an issue of material fact that must be decided by a jury.

Additionally, the plaintiff's deliberate indifference claim cannot succeed as a matter of law because the record does not establish that she was excluded from any educational opportunity. Although the plaintiff reported that she experienced ongoing emotional and psychological harm, she does not identify a particular effect that this had on her education. Rather, the record reflects that she graduated on time, magna cum laude. Cf. Gabrielle M. v. Park Forest-Chicago Heights,

Ill. Sch. Dist. 163, 315 F.3d 817, 823 (7th Cir. 2003) (holding that there was no concrete, negative effect on education where plaintiff was "diagnosed with some psychological problems" following harassment). Absent "necessary evidence of a potential link between her education and [A.G.'s] misconduct," the plaintiff's claim cannot survive summary judgment. See Davis, 526 U.S. at 652.

ii. Erroneous outcome. The entry of summary judgment for the defendants also was warranted as to the plaintiff's claim of erroneous outcome. "[T]he applicable standard for [a] Title IX claim challenging [a university's] disciplinary procedures on erroneous outcome grounds requires that a plaintiff offer evidence 'cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and indicating that 'gender bias was a motivating factor.'" Trustees of Boston College, 892 F.3d at 90, quoting Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994). Viewing the facts in the light most favorable to the plaintiff, neither necessary element could be established on this record.

Estabrook's intervention, whatever its propriety, ultimately had little if any effect on the accuracy of the SCB's final decision. Hypothetically, by reversing the appeals board's decision to allow an appeal, Estabrook could have limited the issues that the SCB could have considered on appeal

to purely procedural matters.  Subsequently, however, Estabrook allowed the plaintiff to file an amended appeal, and the matter was remanded for a new hearing before the SCB based on new evidence.  Although the appeals board had denied the plaintiff's amended appeal on the ground of procedural error, after concluding that there had been none, on remand the SCB nonetheless considered the procedures employed at its first hearing, and stated in its decision that it found that no procedural errors had occurred at the initial hearing.  Thus, it would appear that the plaintiff ultimately had the benefit of the full appeal of the procedures that she initially had sought.

In addition, even if there were any doubt about the accuracy of the proceeding, there was no evidence that any error was the product of gender bias.  Although the plaintiff is correct that bias may be inferred when "the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence)," Columbia Univ., 831 F.3d at 57, no such inference is appropriate here. Estabrook's intervention does not lack an apparent reason based in the evidence; she indicated that she overturned the appeals board's decision due to her perception of procedural inadequacies (allowing an appeal where no ground for appeal had been stated) and unfairness due to lack of notice.

Further, any possible inference of bias would "not necessarily relate to bias on account of sex" (emphasis added). Id. Other than the plaintiff's unsupported assertion that "reporting sexual assault victims are overwhelmingly female," she does not identify any evidence to support the additional conclusion that Estabrook's decision was spurred by gender bias. Without evidence of "a causal connection between the outcome of [the] disciplinary proceedings and gender bias," Trustees of Boston College, 892 F.3d at 91, the plaintiff's claim asserting an erroneous outcome must fail.

Judgment affirmed.